HON. CARLOS ROMERO BARCELÓ, GOBERNADOR DE PUERTO RICO, demandante y recurrido, *v.* MIGUEL HERNÁNDEZ AGOSTO, PRESIDENTE DEL SENADO; HON. FRANCISCO APONTE PÉREZ, PRESIDENTE DE LA COMISIÓN DE LO JURÍDICO DEL SENADO DE PUERTO RICO, demandados y peticionarios.

*Número:* O-84-204 *Resuelto:* 1 de mayo de 1984

370

*Marcos A. Ramírez*, de *Ramírez & Ramírez*, abogado de los peticionarios; *Héctor Urgell Cuebas*, abogado del Hon. Carlos Romero Barceló, Gobernador de Puerto Rico, recurrido; *Manuel D. Herrero*, Comisionado Electoral alterno del P.N.P., abogado de los Comisionados Electorales del P.N.P.; *Miguel E. Herrero Frank*, de *Herrero, Castro & Porrata Doria*, y *Jorge F. Romany*, abogados de tres senadores y una candidata a senadora, interventores.

El Juez Presidente Señor Trías Monge emitió la opinión del Tribunal.

El 20 de marzo de 1984 el señor Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, interpuso demanda contra el señor Presidente del Senado de Puerto Rico, Hon. Miguel Hernández Agosto, y contra el señor Presidente de la Comisión de lo Jurídico del Senado, Hon. Francisco Aponte Pérez. Alegó que el 15 de febrero y el 2 de marzo de 1984 el Presidente de la Comisión Electoral había autorizado la utilización de fondos públicos para la transmisión por televisión de las vistas a celebrarse por la Comisión de lo´ Jurídico sobre el P. del S. 1094, que propone la creación del cargo de Fiscal Especial Independiente para investigar los sucesos

acaecidos en el Cerro Maravilla; que las vistas comenzarían el propio día 20, y que su transmisión violaría las disposiciones del Art. 8.001 de la Ley Electoral y de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico. El demandante solicitó del tribunal que le prohibiese al Senado de Puerto Rico y a su Comisión de lo Jurídico emplear fondos públicos para televisar las referidas vistas. Demandas similares se presentaron por los comisionados electorales del Partido Nuevo Progresista, los senadores Efraín Santiago, Mercedes Torres Vda. de Pérez y Rolando A. Silva y por la señorita Albita Rivera.

El tribunal de instancia resolvió que no procede la acción interdictal contra el Senado de Puerto Rico o sus miembros, en su carácter de legisladores, por prohibirlo la doctrina de inmunidad parlamentaria. Ordenó, no obstante, proseguir la causa como un pleito de sentencia declaratoria y en el entretanto abstenerse de pagar con fondos públicos las vistas televisadas.

Los legisladores demandados incoaron petición de *certiorari* ante este Tribunal. Alegan que están protegidos por la inmunidad parlamentaria y que la demanda debe desestimarse. En auxilio de nuestra jurisdicción, paralizamos los procedimientos en instancia y dejamos sin efecto temporalmente la orden emitida. Examinadas las contenciones de las partes procedemos a resolver.

El caso de autos encierra una cuestión de interpretación estatutaria. Para precisar sus reducidas dimensiones es necesario examinar su trasfondo constitucional y científico-político. Ello exige explorar asuntos tales como las funciones de la Rama Legislativa en un régimen de separación de poderes, la razón de ser de la doctrina de inmunidad parlamentaria, el desarrollo del derecho a la información y otros temas afines.

1. *Las funciones parlamentarias*

El entendimiento de las funciones del parlamento en regímenes democráticos fundados en la separación de po-

deres es indispensable para el debido enfoque de la doctrina de inmunidad. Ambos asuntos están entrelazados.

El error común que se comete sobre este particular consiste en creer que las asambleas representativas cumplen sólo un menester: legislar. Desde mediados del siglo dieciocho Montesquieu aludía a otras funciones. "The great advantage of representatives", escribía, "is, their capacity of discussing public affairs." Además de la facultad de legislar, mencionaba la obligación de ver "whether the laws in being are duly executed, a thing suited to their abilities, and which none indeed but themselves can properly perform". C. de Montesquieu, *The Spirit of Laws*, en *Great Books of the Western World* (R. M. Hutchins, ed.), Chicago, Ed. Encyclopaedia Britannica, Inc., 1952, Vol. 38, pág. 71.

En 1861, John Stuart Mill afirmaba en su obra *Representative Government*:

> . . . the proper office of a representative assembly is to watch and control the government: to throw the light of publicity on its acts: to compel a full exposition and justification of all of them which any one considers questionable; to censure them if found condemnable, and, if the men who compose the government abuse their trust, or fulfill it in a manner which conflicts with the deliberate sense of the nation, to expel them from office. . . . *Great Books of the Western World,* supra, Vol. 43, pág. 361.

Muchos años antes de advenir a la presidencia de Estados Unidos, Woodrow Wilson se expresó así sobre las funciones del Congreso:

> Quite as important as legislation is vigilant oversight of administration; and even more important than legislation is the instruction and guidance in political affairs which the people might receive from a body which kept all national concerns suffused in a broad daylight of discussion.

W. Wilson, *Congressional Government,* New York, World Pub. Co., 1956, pág. 195 (el libro fue escrito en 1883–1884 y publicado poco después). Véanse: *Hutchinson* v. *Proxmire,* 443 U.S. 111 (1979); *Eastland* v. *United States Servicemen's*

*Fund*, 421 U.S. 491 (1975); *Tenney* v. *Brandhove*, 341 U.S. 367 (1951); H. Laski, *The American Democracy*, New York, Viking Press, 1948, págs. 75, 83, 89-90.

Varias conclusiones son derivables de lo anterior:

■ 1. Entre sus muchas funciones esenciales, un parlamento ejerce, además de la de formular las leyes, las de fiscalizar el gobierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública.

■ 2. Las facultades de legislación, investigación, fiscalización, discusión y divulgación provienen del propio concepto de un gobierno dividido en tres poderes coordinados, mas separados, independientes y de idéntico rango.

■ 3. Las funciones de investigación, fiscalización, discusión y divulgación no están subordinadas a la de legislación. Un debate o la divulgación de un debate, por ejemplo, no extrae su validez de la formación de un estatuto. Estas otras funciones contienen en sí su propia justificación, en cuanto contribuyen al desempeño por una asamblea representativa de su papel constitucional. Sobre este extremo ha escrito J. Stuart Mill, *loc. cit.*:

> Representative assemblies are often taunted by their enemies with being places of mere talk and *bavardage*. There has seldom been more misplaced derision. I know not how a representative assembly can more usefully employ itself than in talk, when the subject of talk is the great public interests of the country, and every sentence of it represents the opinion either of some important body of persons in the nation, or of an individual in whom such body have reposed their confidence. A place where every interest and shade of opinion in the country can have its cause even passionately pleaded, in the face of the government and of all other interests and opinions, can compel them to listen, and either comply, or state clearly why they do not, is in itself, if it answered no other purpose, one of the most important political institutions that can exist anywhere, and one of the foremost benefits of free government.

■ 4. El despojo o la limitación de alguna de las fun-

ciones básicas de un parlamento socavaría la base misma de la democracia en el país concernido.

Los principios señalados generan cuestiones subsidiarias que afectan la interpretación del estatuto envuelto en este caso. Se discutirán más adelante. Pasemos a examinar ahora la doctrina de la inmunidad parlamentaria y su enlace con las normas expuestas.

## 2. *La doctrina de la inmunidad*

La doctrina se desarrolló en Inglaterra como parte de la lucha del Parlamento para defender sus prerrogativas e independencia frente a la Corona y al Poder Judicial. Véanse: R. Reinstein & H. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113 (1973); Comentario, *The Constitutional Limits of the Speech or Debate Clause*, 25 UCLA L. Rev. 796 (1978); L. R. Yankwich, *The Immunity of Congressional Speech—its Origin, Meaning and Scope*, 99 U. Pa. L. Rev. 960 (1951).

En la Carta de Derechos de 1688, I Will. & Mar. sess. 2 c. 2, 6 *Halsbury's Statutes of England* 489-490 (1969), se logró finalmente insertar la base de la doctrina, al consagrarse, "That the freedome of speech and debates or proceedings in Parlyament ought not to be impeached or questioned in any court or place out of Parlyament."

Esta cláusula constituyó la fuente del último párrafo del artículo quinto de los Artículos de Confederación, en que se dispuso:

> Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress, and the members of Congress shall be protected in their persons from arrests and imprisonments, during the time of going to or from, and attendance on, Congress, except for treason, felony, or breach of the peace.

El principio se adoptó prácticamente sin discusión en el Art. I, Sec. 6 de la Constitución de Estados Unidos, donde se decretó que los miembros del Congreso:

... shall, in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

■ Thomas Jefferson describió así el propósito de la cláusula, el cual rebasa su sentido literal:

[I]n order to give the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance of coercion of the coordinate branches, Judiciary and Executive. ... 8 *Writings of Thomas Jefferson* 322 (Ford ed. 1904).

La doctrina de la inmunidad parlamentaria responde, en suma, al objetivo de preservar la independencia legislativa dentro de un sistema de separación de poderes. Reinstein & Silverglate, *op. cit.*, pág. 1121. La conciencia de tal objetivo es vital ya que, conforme Madison, para definir el ámbito del privilegio, "the reason and necessity of the privilege must be the guide". 4 *Writings of James Madison* 221 (Hunt ed. 1910).

El privilegio se definió desde temprano en forma amplia. En *Coffin* v. *Coffin*, 4 Mass. 9 (1808), se expresó que la inmunidad cubría "everything said or done by ... a representative in the exercise of the functions of that office". Véase: X.L. Suárez, *Congressional Immunity: a Criticism of Existing Distinctions and a Proposal for a New Definitional Approach*, 20 Vill. L. Rev. 97 (1974). El Tribunal Supremo de Estados Unidos rechazó desde el comienzo de su análisis de la cláusula constitucional concernida interpretaciones restrictivas de la misma. En *Kilbourn* v. *Thompson*, 103 U.S. 168, 204 (1881), se afirmó:

It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though

in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it.

En *Tenney* v. *Brandhove*, supra, págs. 373, 376-377, se dictaminó:

The reason for the privilege is clear. It was well summarized by James Wilson, an influential member of the Committee of Detail which was responsible for the provision in the Federal Constitution. "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence."

. . . . . . .

We come then to the question whether from the pleadings it appears that the defendants were acting in the sphere of legitimate legislative activity . . . .

The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader . . . . The holding of this Court in *Fletcher* v. *Peck*, 6 Cranch 87, 130, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.

Este último concepto fue reiterado en *Dombrowski* v. *Eastland*, 387 U.S. 82, 84-85 (1967), en opinión unánime:

It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the Speech or Debate Clause of the Constitution, *Kilbourn* v. *Thompson*, 103 U.S. 168, 204 (1881), that legislators engaged "in the sphere of legitimate legislative activity," *Tenney* v. *Brandhove*, supra, 341

U.S., at 376, should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.

█ Está firmemente establecido que la "esfera de actividad legislativa legítima" incluye lo que ocurra en los procesos de deliberación, comunicación, investigación y otros actos que tengan lugar en el hemiciclo de las cámaras o en las salas de las comisiones. *Eastland* v. *United States Servicemen's Fund*, supra, págs. 503–504; *Gravel* v. *United States*, 408 U.S. 606, 625, (1972); *Doe* v. *McMillan*, 412 U.S. 306, 312–313 (1973); Comentario, *A New Perspective on Legislative Immunity in Section 1983 Actions*, 28 UCLA L. Rev. 1087 (1981).[1]

Las siguientes normas se desprenden de lo discutido hasta ahora:

█ 1. El propósito básico de la cláusula de inmunidad es garantizar la independencia de la Rama Legislativa y fortalecer así el sistema de la separación de poderes.

█ 2. El ámbito de la inmunidad es extenso. Cubre toda actividad legislativa legítima, lo que incluye, a lo menos, las que se desarrollen en el hemiciclo de las cámaras y el seno de las comisiones.

█ 3. Por las razones discutidas en la sección anterior, son actividades legislativas legítimas, además de la de formular las leyes, la de investigar y fiscalizar el Gobierno, la de debatir asuntos de interés público y la de mantener informado al pueblo sobre la marcha de la cosa pública. Estas funciones, por definición, están protegidas por la doctrina de la inmunidad parlamentaria.

█ 4. Los motivos que inspiren una actividad legislativa legítima no son objeto apropiado de escrutinio judicial. La doctrina de la inmunidad parlamentaria pierde su valor

---

[1] Es innecesario expresarnos sobre la extensión o no de la inmunidad a otros lugares o personas o a circunstancias en que los valores en conflicto pueden ser diferentes a los que chocan aquí.

si es que un legislador o un organismo legislativo tiene que someterse al rigor de procedimientos judiciales por el ejercicio vigoroso de sus prerrogativas.

La cláusula de inmunidad de la Constitución de Estados Unidos no aplica a los estados, como tampoco a Puerto Rico. *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U.S. 391, 404 (1979). El Congreso nunca quiso concederles a los miembros de la Asamblea Legislativa de Puerto Rico la inmunidad parlamentaria tradicional, contrario a lo sucedido en la Ley Orgánica de Hawaii (31 Stat. 141, Ch. 339, Ley de 30 de abril de 1900, Secs. 28 y 29), la de Alaska (37 Stat. 512, Ley de 24 de agosto de 1912, Sec. 12) y la de Filipinas (39 Stat. 545, Ley de 29 de agosto de 1916, Sec. 18). La inmunidad parlamentaria se conoció en Puerto Rico tan sólo por ley local de 21 de febrero de 1902 (2 L.P.R.A. secs. 12 y 13). No fue hasta la aprobación del Art. III, Sec. 14 de la Constitución del Estado Libre Asociado que la doctrina de la inmunidad parlamentaria adquirió rango constitucional. En *In re Rodríguez Torres*, 106 D.P.R. 698, 705-725 (1978), nos expresamos sobre su diseño y alcance generales. Baste repetir aquí la conclusión de que "nuestro ordenamiento constitucional le preservó ancho campo al privilegio de la inmunidad parlamentaria, al menos tan ancho como se le reconoce en la jurisprudencia de Estados Unidos". Pág. 721.

Discutamos a continuación otro método constitucional de realzar las funciones parlamentarias y vigorizar el sistema de separación de poderes.

3. *La diseminación parlamentaria de información*

Este tema exige el examen de una cláusula que por lo general no ha recibido gran atención de los tribunales.

a) *La experiencia inicial inglesa y norteamericana*

El Parlamento inglés, durante el período de su fragilidad frente a la Corona y su fiel herramienta, la Judicatura, no se inclinó usualmente a la publicación de sus procedimientos,

fuere por la prensa o por sus propios miembros. La norma de secretividad intentaba amparar a los legisladores contra la venganza de los monarcas que descubriesen airados que sus actuaciones fuesen objeto de crítica en los debates o sus prerrogativas socavadas. El Parlamento no contaba con un diario de sesiones hasta 1547. Desde 1641, la Cámara de los Comunes contaba con una regla que prohibía la publicación de sus procedimientos, excepto con el consentimiento específico de la Cámara. 34 *Halsbury's Laws of England* 460–461 (1980). Reinstein & Silverglate, *op. cit.*, págs. 1137–1138.

La Convención Constituyente de Estados Unidos alteró drásticamente esta situación. Algunas colonias habían comenzado a hacer públicos sus procedimientos legislativos hacia 1770, con favorable impacto en la creación de una ciudadanía más informada sobre lo que estaba sucediendo. Ello llevó a la aprobación, tras considerable debate, del Art. I, Sec. 5, cláusula 3 de la Constitución de Estados Unidos, en que se expresa:

> Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one-fifth of those Present, be entered on the Journal.

Véase: Reinstein & Silverglate, *loc. cit.*

Esta disposición constitucional, que a primera vista, si es que se desatiende su fundamento, parece innocua, consagra una de las funciones parlamentarias más trascendentes —la más importante para Woodrow Wilson, según hemos visto— la de informar a la ciudadanía sobre el funcionamiento de su gobierno. Véanse: Suárez, *op. cit*, pág. 128; Comentario, *Legislative Immunity and Congressional Necessity*, 68 Geo. L.J. 783, 793–801 (1979); M. Shapiro, *Judicial Review: Political Reality and Legislative Purpose: the Supreme Court's Supervision of Congressional Investigations*, 15 Vand. L. Rev. 535 (1962).

Sobre la función informativa ha escrito Brandeis: "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." J. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914) citado en *Legislative Inmunity*, supra, pág. 796 n. 123.

Carl Friedrich ha señalado a su vez:

> The political function of representative assemblies today is not so much the initiation of legislation as the carrying on of popular education and propaganda and the integration and co-ordination of conflicting interests and viewpoints. C. Friedrich, *Constitutional Government and Democracy*, 2da ed. rev., New York, 1950, pág. 297.

b) *La experiencia puertorriqueña*

En Puerto Rico no se conoció hasta la aprobación de la Constitución del Estado Libre Asociado una cláusula equivalente al Art. I, Sec. 5, cláusula 3 de la Constitución de Estados Unidos. En 1903 la Cámara de Delegados intentó infructuosamente proveer para la publicación de un diario de sesiones. G. Lewis, *Puerto Rico, Freedom and Power in the Caribbean*, New York, Monthly Rev. Press, 1963, pág. 349.

La facultad de la nueva Asamblea Legislativa para darle debida publicidad a sus procedimientos no dependía técnicamente de la inserción en la Constitución de una cláusula a tales efectos. Había desaparecido la razón histórica para mantener secretos los debates, y el sistema de separación de poderes que se estaba adoptando proveía base adecuada para el ejercicio, por el poder legislativo, de la facultad parlamentaria establecida de mantener al pueblo informado sobre sus actividades. Aun así, la Convención Constituyente resolvió, al igual que un buen número de estados, disponer expresamente la publicación de un diario de sesiones, tal como se estaba haciendo con los procedimientos de la propia Convención Constituyente.

El resultado fue la tercera oración de la Sec. 17 del Art. III, la cual provee:

Se dará publicidad a los procedimientos legislativos en un diario de sesiones, en la forma que se determine por ley.

Este lenguaje no excluye la divulgación de los procedimientos legislativos por otros medios de comunicación, según la interpretación del Congreso y muchas otras asambleas representativas, asunto que discutiremos más adelante.

Los debates de nuestra Convención Constituyente contienen un interesante intercambio de impresiones sobre la cláusula que nos ocupa. El delegado Paz Granela fue quien propuso la referencia específica a un diario de sesiones.

Sr. Paz Granela: Señor Presidente: La enmienda consiste en lo siguiente: que se . . . agregue "y sus deliberaciones se publicarán en un diario de sesiones, en la forma provista por la Asamblea Legislativa".

. . . . . . . .

Señor Negrón López: Señor Presidente: Quiero decir que no me opongo a la proposición que ha hecho el delegado, señor Paz Granela, pero deseo aclarar, . . . que la disposición que él desea insertar en el artículo 10 [de la Proposición Sustituta] aparece insertada por la Comisión de la Rama Legislativa en el artículo 12, cuando expresa . . . "las cámaras llevarán libros de actas donde harán constar lo relativo al trámite de los proyectos y las votaciones emitidas a favor y en contra de los mismos." . . . "Se dará publicidad a los procedimientos legislativos en la forma que se determine por ley."

Cuando se aprobó la Constitución de los Estados Unidos, naturalmente no existían los medios de publicación y de impresión que existen hoy, y ese lenguaje sirvió para llevar constancia de sus procedimientos en la forma en que se hacía entonces hace 170 años . . . .

El lenguaje que nosotros adoptamos es un lenguaje de orden general, de tipo general, sin mencionar el diario de sesiones . . . .

Ahora, para información de la Convención queremos decir que la fraseología que aparece en el artículo 12 va encaminada a proveer lo que contempla la proposición del delegado, señor Paz Granela, para que se lleve un diario de sesiones de una manera similar a la que se ha utilizado en esta Convención Constituyente.

Poco después, el delegado Figueroa Carreras le pregunta al presidente de la Convención:

> Sr. Figueroa Carreras: ¿No cree el compañero que si la intención es que haya un diario de sesiones, debemos expresarlo así y podemos intercalarle ahí una enmienda que diga, por ejemplo —cuando llegue el momento— "dará publicidad a los procedimientos legislativos en un diario de sesiones o en la forma", etc., etc.
>
> Sr. Negrón López: *Pero al decir que se dará publicidad a los procedimientos, lo que se está pensando es que las personas que vengan a integrar los cuerpos legislativos no estén atadas por una fórmula específica de la manera de ellos publicar los procedimientos parlamentarios* . . . .
>
> *Yo no tengo ninguna objeción a que se diga "diario de sesiones", pero puede haber, dentro de 50 años, un procedimiento mejor* . . . .
>
> Sr. Figueroa Carreras: . . . *la forma que yo sugiero deja abierta la puerta a toda posibilidad, a toda probabilidad. Es decir, que podrá hacerlo en la forma que quiera* . . . . *Queremos el diario de sesiones, pero que si la eventualidad ésa surge dentro de 50 años, para eso establecemos la alternativa de que cualquier otro procedimiento* . . . ." (Énfasis nuestro.) 2 Diario de Sesiones de la Convención Constituyente 852-853 (1951).

Como puede observarse, los debatientes coincidieron en no atar las manos de los legisladores del futuro sobre la forma de divulgar sus procedimientos. La diferencia consistió en que la mayoría de los delegados optó por ordenar constitucionalmente la publicación de un diario de sesiones. Según se revela más tarde, las reservas del señor Negrón López se debían a las dificultades sufridas por la propia Asamblea Constituyente en la publicación de su diario. 3 Diario de Sesiones de la Convención Constituyente 1939-1941 (1952).

 Nada evidencia mejor la naturaleza no excluyente de la cláusula correspondiente de la Constitución de Estados Unidos, la cual influyó claramente la nuestra y las de aquellos estados cuyas constituciones contienen disposiciones comparables, que el examen del uso de la televisión por el Congreso, sus comisiones y organismos estatales análogos.

c) *El uso de la televisión por órganos legislativos en Estados Unidos*

En la demanda presentada en este caso se expresa que "en Puerto Rico se estaría creando un precedente único dentro de toda la nación norteamericana de televisar vistas de la Rama Legislativa pagadas con fondos públicos en un año eleccionario donde los protagonistas son candidatos del partido que gobierna dicho Cuerpo". La realidad es otra.

El número de estados que televisa parte o la totalidad de sus procedimientos es abrumador. En 1978, el número alcanzaba a cuarenta y cinco. J. D. Mullican, *Public Television Coverage of State Legislatures: Funding, Costs, Editorial Control, Equipment, Staffing and Formats*, Denver, Nat'l. Conf. St. Legis., 1978, pág. 2. (A menos que se indique lo contrario, los datos que aquí se citan provienen de este estudio.)

El Congreso comenzó a televisar desde 1947 diversos procesos de investigación a cargo de algunas de sus comisiones. Desde los tiempos de Watergate, en 1974, el empleo de la televisión se hizo cada vez más intenso. Desde 1979 se ha permitido televisar todos los procedimientos en el hemiciclo de la Cámara de Representantes de Estados Unidos. 39 Cong. Q. 595 (1983); 123 Cong. Rec. 35425 (1977).

Los costos de transmisión se han subvencionado en formas distintas. El uso de fondos públicos para cubrir estos gastos, total o parcialmente, no es una práctica extraña. Se estila a tal efecto en varios estados efectuar asignaciones directas o indirectas, a través de contribuciones adicionales a las estaciones públicas. El empleo de la televisión pública representa, por supuesto, la erogación de fondos gubernamentales. Todo programa cuenta. No hemos hallado jurisdicción alguna donde se detenga la transmisión directa de procedimientos legislativos por razón de que se trate de un año eleccionario o por estar presentes entre los legisladores candidatos a reelección. La transmisión de los procedimien-

tos de la Cámara de Representantes de Estados Unidos relacionados con Watergate ocurrió mayormente en un año de elecciones para la totalidad del cuerpo.

El uso extenso de la televisión para la transmisión de procedimientos legislativos no se logró de inmediato. Hubo que refutar fuertes ataques aislados. El congresista Owens, por ejemplo, se manifestó en una ocasión:

> Rather than creating a political circus, as some have alleged, I believe that the television cameras will keep the participants serious and alert. 120 Cong. Rec. 24440 (1974).

El *Washington Post* expresó sobre el particular:

> Many legislators initially feared that television would make a circus of floor proceedings . . . .
> But in most states television coverage has produced change for the good. At minimum, decorum has improved . . . . The substance of legislating has also improved.

N. R. Peirce, *Can Television Get into Congress?*, Wash. Post, 12 de abril de 1977, citado por J. B. Anderson, 123 Cong. Rev. 11508 (1977).

El uso de la televisión por las asambleas representativas ha fortalecido más bien su independencia frente al poder ejecutivo. Véase: Robinson, *A Twentieth-Century Medium in a Nineteenth-Century Legislature: the Effects of Television on the American Congress,* en N. J. Ornstein, *Congress in Change,* New York, Praeger Pubs., 1975, pág. 240 y ss.

El tema discutido en esta sección permite las siguientes conclusiones generales:

1. La función parlamentaria de mantener informado al pueblo sobre los procedimientos legislativos y la marcha de la cosa pública fluye tanto de la doctrina de separación de poderes como de la cláusula referente a la publicación de su diario de sesiones.

2. La alusión a un diario de sesiones en las constituciones de Estados Unidos y Puerto Rico no significa que tal sea el único modo de cumplir el Congreso y la Asamblea

Legislativa su obligación informativa. Puede optarse también por el uso de la televisión.

3. El empleo de la televisión para la transmisión de procedimientos legislativos constituye más la regla en Estados Unidos que una excepción aislada.

4. Las predicciones sobre el efecto nefasto de la televisión para los fines descritos no han sido acertadas. La experiencia hasta ahora revela que la televisión puede contribuir al desarrollo de una ciudadanía más informada. Su uso por una Asamblea Legislativa coadyuva al mejor funcionamiento de la separación de los poderes.

Corresponde ahora que examinemos el papel de la judicatura respecto a la invocación de la cláusula de inmunidad y el ejercicio parlamentario de la función informativa.

### 4. *El papel de la judicatura*

Como intérprete máximo de la Constitución del Estado Libre Asociado le corresponde a este Tribunal determinar los contornos de sus cláusulas. *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 759–760 (1977); *Peña Clos* v. *Cartagena Ortiz*, 114 D.P.R. 576 (1983). Tal principio no prejuzga la amplitud o estrechez de determinada facultad legislativa o ejecutiva y el grado de escrutinio judicial a que debe sujetársele. Hay que tomar en cuenta las razones históricas y sociales que motivaron su reconocimiento y el papel que para su medición les asigna a los tribunales la doctrina de separación de poderes.

Sobre el particular se ha escrito:

> *These considerations indicate that in executive-motivated suits, any contemporary legislative practice which is necessary to fulfill one of the goals of representative government should fall within the ambit of the speech or debate clause.* In considering whether a given practice is protected by the clause, guidance is available in the actual workings of Congress to determine whether it is widely utilized by members in the performance of their duties. But *the ultimate focus must be the functioning of the legislature according to the doctrine of sepa-*

*ration of powers, so that the privilege, which is an historical derivative of that doctrine, will continue to be defined by it . . . .* For example, crimes such as assault and battery or armed robbery should be beyond the scope of the privilege, even if fortuitously committed within the walls of the Capitol. Such crimes are not legislative functions, and their commission in no way supports the system of separate powers.

A broad construction of the privilege in cases involving conflicts between the executive and legislators is also necessitated by considerations of judicial independence. *Courts do violence to a democratic separation of powers when they legitimize executive assaults upon legislative prerogatives. If the courts define the privilege narrowly, so as to entertain on the merits executive-motivated challenges to legislative activities, they will subject themselves to weighty pressures which threaten to politicize their processes . . . .*

*Judicial neutrality can be assured only by a broad definition of the privilege, which leaves judgments about the propriety of specific exercises of legislative functions in the political arena.* Which legislators are heroes in their conflicts with the executive, and which are villains, is a matter best left to the collective deliberation of their colleagues and of their constituents. (Escolio omitido y énfasis nuestro.) Reinstein & Silverglate, *op. cit.*, págs. 1146–1148.

En Suárez, *op. cit.*, págs. 129, 142 se afirma:

A legislator's function is inherently political. The representation of people by voicing their views and shaping policy accordingly is not susceptible to the kind of distinction which separates "legislative" from "political" activities. Such a distinction is an arbitrary straightjacket, imposed by courts which may not understand the legislative function.

. . . . . . . .

To my mind, there is a strong connection between the independence of each branch of our government and the constitutional protection of speech or debate. In this sense, the clause is much more than a personal prerogative to protect the dignity of Congressmen: It is a safeguard for the institution of Congress, an explicit guarantee that its members will not be hindered in the exercise of their legislative functions.

What this means in practical terms is that the Court must

realize that its discretion in the area of congressional immunity is very limited . . . .

The courts must, of course, decide whether challenged congressional action comes under the protection, but in doing so they should consult less their own notions of what constitutes legislative acts and more what Congress thinks them to be. (Escolios omitidos.)

En *Tenney* v. *Brandhove,* supra, págs. 377–378, expresó el Tribunal Supremo de Estados Unidos:

Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. (Escolio omitidos.)

Véanse: *United States* v. *Helstoski,* 442 U.S. 477, 487–489 (1979); *Eastland* v. *United States Servicemen's Fund,* supra, págs. 508–509; *United States* v. *Johnson,* 383 U.S. 169 (1966).

Por último, en *Peña Clos* v. *Cartagena Ortiz,* supra, pág. 592, dijimos:

Respecto a la cláusula de inmunidad, por ejemplo, la tarea judicial se limita a inquirir si el derecho a la libre expresión parlamentaria se ha ejercido dentro de su ancho marco constitucional. La cuestión nunca ha sido la de indagar la naturaleza de la expresión en sí para luego resolver si es permisible a la luz de un interés alegadamente mayor.

Examinadas nuestras propias circunstancias constitucionales formulamos las conclusiones siguientes:

1. La cláusula de inmunidad de la Constitución del Estado Libre Asociado de Puerto ampara las funciones legislativas derivadas de la doctrina de la separación de poderes.

2. La práctica, conocida en tantas jurisdicciones, de televisar los procedimientos de las cámaras y sus comi-

siones es parte de la tradicional función informativa de las asambleas parlamentarias. Como tal está protegida por la cláusula de inmunidad.

3. La tarea de los tribunales en el caso de este género de choque entre las ramas ejecutiva y legislativa del Gobierno se limita a indagar si se trata de una práctica legislativa legítima, debidamente ligada a alguna de las funciones tradicionales de los parlamentos y sus integrantes dentro de un sistema de separación de poderes.

4. La evaluación de lo que se exprese o haga en el curso de procedimientos legislativos, sea en el hemiciclo o en las comisiones, le corresponde al electorado y no a los tribunales. La televisión de esos procedimientos permite la fiscalización más adecuada por la ciudadanía. La función judicial estriba en delinear la esfera de actividad legislativa legítima dentro de un sistema de separación de poderes.

Con el trasfondo de las secciones de esta opinión que anteceden, procedamos a examinar el estatuto invocado para detener el uso de fondos públicos destinados a subvencionar la televisión de las vistas de la Comisión de lo Jurídico del Senado y, por extensión, de toda otra actividad legislativa de similar naturaleza.

5. *El estatuto*

El Art. 8.001 de la Ley Electoral vigente, Ley Núm. 4 de 20 de diciembre de 1977, según enmendado por la Ley Núm. 3 de 10 de enero de 1983 (16 L.P.R.A. sec. 3351), dispone:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones.

La referencia a la Asamblea Legislativa y a la Rama Judicial fue insertada por la mencionada legislación de 1983. El artículo citado proviene en todos sus aspectos esenciales del Art. 3-014 del Código Electoral derogado, Ley Núm. 1 de 13 de febrero de 1974.

Al extenderse en 1983 a la Asamblea Legislativa la prohibición que data de 1974, ¿fue la intención legislativa recortar la inmunidad parlamentaria y sujetar su función informativa sobre actividades legislativas legítimas al criterio de otros organismos, ejecutivos, cuasijudiciales y judiciales? Los datos que hemos expuesto tan largamente en esta opinión revelan que estamos hablando de dos de las facultades más críticas al funcionamiento adecuado, a la existencia misma, de una asamblea representativa. La pregunta formulada encierra otra de dimensión constitucional extremadamente seria. ¿Puede la Asamblea Legislativa renunciar o mutilar sus prerrogativas y funciones más esenciales?

Esta espinosa cuestión constitucional no tiene que ser contestada aquí. Ni el texto ni el historial del estatuto envuelto en este caso la plantean. Según ha expresado el Tribunal Supremo de Estados Unidos en *United States* v. *Helstoski*, supra, págs. 490–491, en el caso de una alegada renuncia por un legislador a su inmunidad:

Like the District Court and the Court of Appeals, we perceive no reason to decide whether an individual Member may waive the Speech or Debate Clause's protection against being prosecuted for a legislative act. Assuming that is possible, we hold that waiver can be found only after explicit and unequivocal renunciation of the protection. The ordinary rules for determining the appropriate standard of waiver do not apply in this setting.

█ Hemos escudriñado el historial legislativo de la Ley Núm. 3 de 10 de enero de 1983 y no hemos hallado indicación alguna de que, al incluirse a la Asamblea Legislativa en la prohibición expuesta en el Art. 8.001, la intención de ésta fuese renunciar a parte sustancial de sus prerrogativas y abolir toda posibilidad de televisar sus procedimientos a menos que medie el consentimiento de la Comisión Estatal de Elecciones y de los tribunales. El historial de la Ley Núm. 4 de 20 de diciembre de 1977 sobre el significado del Art. 8.001 es igualmente magro.

█ El propio texto de la ley vigente, no obstante, junto al historial de su fuente, el Art. 3-014 de la Ley Núm. 1 de 13 de febrero de 1974, revelan que el alcance de la ley vigente es mucho más modesto. Lo que dispone el Art. 8.001 actual es simplemente que, desde el 1ro de enero hasta la celebración de una elección general, las ramas del Gobierno no deben incurrir en gastos para la compra de tiempo y espacio en los medios de difusión pública "con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes". La televisión de un procedimiento parlamentario, cuya difusión aun tiene base constitucional, no representa ciertamente la exposición de "programas, proyectos, logros, realizaciones, proyecciones o planes", hecho que de por sí hace totalmente inaplicable a este caso el Art. 8.001. Véanse las expresiones del Juez Dávila en *P.P.D.* v. *Junta Revisora Electoral*, 109 D.P.R. 464 (1980), caso en que este Tribunal se negó a revisar una decisión de la Junta Revisora Electoral en que se permitía la publicación con fondos públicos de una invitación del señor Gobernador a celebrar el Día de Reyes de 1980 en La Fortaleza, ya que no se trataba de la exposición de "programas, proyectos, logros, realizaciones, proyecciones o planes". La divulgación de los procedimientos legislativos cumple un propósito de estirpe constitucional, claramente distinguible del proselitismo que anima la propaganda electoral. La ley se refiere más bien a anuncios y propaganda sobre tales programas, logros, etc.

 En el Diario de Sesiones de la Asamblea Legislativa correspondiente al 4 de febrero de 1974, pág. 154, consta la siguiente explicación proveniente del informe de diversas comisiones sobre el Código Electoral propuesto:

Finalmente se prohíbe a las agencias gubernamentales *anunciarse.* Se les limita a publicar solamente aquello requerido por ley durante el año de elecciones, y solamente en caso de emergencia, se podrá publicar otro tipo de *anuncio,* pero sólo con permiso del Tribunal Electoral.

Más tarde el mismo día, a la pág. 188, se explicó que:

Se prohíbe además, que el gobierno use fondos públicos a través de sus agencias para hacer campaña política, efectivo el primero de enero en el año de elecciones. Todas estas disposiciones tienden a liberar a los partidos de la influencia indeseable de los grandes intereses económicos.

Lo citado ilustra el interés en descontinuar durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes. No puede entenderse la legislación vigente como un intento de convertir su limitado objetivo en la peligrosa disminución del histórico derecho a la inmunidad, en el cercenamiento de la función informativa parlamentaria y en una cuestionable obligación judicial de juzgar actuaciones legislativas cuya evaluación le corresponde al electorado del país.

En consideración a lo anterior, *se dejará sin efecto la orden del tribunal de instancia y se desestimará la demanda en este caso.*

Los Jueces Asociados Señores Dávila y Negrón García se inhibieron. El Juez Asociado Señor Rebollo López disiente con opinión.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Los señores jueces que componen un tribunal apelativo,

aislados de por sí del diario acontecer debido a la naturaleza del cargo que ocupan, no pueden darse el lujo de encerrarse en un edificio sin ventanas con el único propósito y objetivo de elaborar normas de derecho con total y completa abstracción de los hechos de un caso y, sobre todo, de la realidad que vive, y ha vivido el pueblo en que conviven.

La supuesta corrección teórica de las normas no lo es el todo, como tampoco puede constituir el único objetivo de la decisión judicial a emitirse. Poco valor tienen las normas jurisprudenciales si sus resultados y efectos dan al traste con las realidades y mejores intereses de los ciudadanos de un país, que en última instancia son los que sufren en carne propia el impacto de las referidas decisiones.

La opinión mayoritaria que se emite en el presente caso es un ejemplo vivo de lo anteriormente expresado. La misma nos recuerda nuestras expresiones en el voto disidente que emitiéramos en el caso de *San Lorenzo Trad., Inc.* v. *Hernández*, (¹) a los efectos de que "lo complicado y elaborado no necesariamente es lo jurídicamente correcto".

La norma que se implanta por mediación de la presente decisión no sólo resulta ser, dados los hechos específicos del caso ante nuestra consideración, incorrecta en su aplicación sino que desastrosa a los mejores intereses del pueblo de Puerto Rico.

I-*El trasfondo histórico*

Hace algunos años escuchamos decir a un amigo que la política había desplazado al juego de la pelota como el deporte nacional de Puerto Rico. Se refería el amigo al hecho de que en nuestro país, a diferencia de otros países democráticos en que la política es tema obligatorio exclusivamente durante el año de elecciones generales, la atención de nuestra ciudadanía es víctima del tema de la política durante los trescientos sesenta y cinco días de cada año por razón de que no bien se celebra una elección general, nues-

---

(¹) 114 D.P.R. 704 (1983).

tros líderes políticos al otro día comienzan la próxima campaña electoral.

Convencidos honesta y genuinamente cada uno de esos líderes políticos del hecho de que tanto ellos como el partido a que cada cual pertenece constituyen la única y mejor solución a los muchos y variados problemas que aquejan a nuestro pueblo, dichos líderes, en ocasiones, se exceden en la medida de su propaganda política. Nuestro pueblo literalmente ha sido "bombardeado" con interminable propaganda de tipo político. La situación se convierte en insostenible[2] cuando se utilizan fondos públicos para costear esa desmedida propaganda política, fondos tan necesarios para la solución de los graves problemas que aquejan a nuestros ciudadanos.

Como corolario de esa genuina y honesta preocupación de nuestros líderes políticos, no es de extrañar, en su consecuencia el hecho de que en los últimos diez años la materia de reglamentación del asunto electoral haya sido objeto de "atención especial" en tres ocasiones distintas por parte de las diferentes administraciones que han dirigido la cosa pública, a saber: en 1974, en 1977 y en 1983.[3]

En ese año de 1974 ocurrió algo fuera de lo común: por primera vez en nuestra historia una administración entendió que debía *autolimitarse* en el gasto de fondos públicos en relación con la política partidista, gesto que, aun cuando incompleto,[4] merece el reconocimiento de todas las personas que creen en una sana administración pública.

---

[2] Y, como veremos más adelante, es ilegal en año de elecciones desde el 1974.

[3] En 1974, dominada tanto la Rama Ejecutiva como la Legislativa por el Partido Popular Democrático, se aprobó la Ley Núm. 1 de 13 de febrero de 1974, conocida como el "Código Electoral de Puerto Rico". En el 1977, cuando dominaba las dos ramas de gobierno mencionadas el Partido Nuevo Progresista, se aprobó la Ley Núm. 4 de 20 de diciembre de 1977, conocida como la "Ley Electoral de Puerto Rico". En el 1983, año en el cual las referidas ramas de gobierno eran dominadas por distintos partidos políticos, se aprobó la Ley Núm. 3 de 10 de enero de 1983, ley que enmendó la citada Ley Núm. 4 de 20 de diciembre de 1977.

[4] Como veremos a continuación, se prohibió el uso de los fondos públicos *exclu-*

Expresando, en su exposición de motivos (⁵) y en lo per-
tienente, que la *"propaganda excesiva* de los partidos y can-
didatos son, entre otros, *formas abiertas y veladas de coac-
ción y violencia electorales"*. (Énfasis suplido.) El legislador
dispuso que:

> Artículo 3-014—Gastos de Agencias.—
> Se prohíbe el que cualquier *agencia de gobierno* incurra en
> gastos en el uso de *cualquier medio de difusión* en que se
> expongan *los programas, proyectos, logros, realizaciones y/o
> planes o proyecciones futuras, desde el día primero de enero
> hasta la fecha del la celebración de la elección general,* excepto
> aquellos anuncios de prensa requeridos por ley. Asimismo, se
> exceptúan aquellos anuncios que sean utilizados para difundir
> *información de interés público,* de urgencia o emergencia, pero
> éstos se permitirán sólo con la autorización previa del Tribu-
> nal Electoral. (Énfasis suplido.)

Como ya expresáramos, en el 1977 se aprobó una nueva
ley electoral por una nueva administración. Se mantuvo, sin
embargo, la prohibición antes transcrita, (⁶) acción que
igualmente merece el reconocimiento de todos.

Celebradas las elecciones de 1980, y pasado un período de
transición, Puerto Rico vive algo totalmente nuevo por pri-
mera vez en su historia: un partido político domina la Rama
Ejecutiva y otro domina *ambas* cámaras legislativas.

---

*sivamente en año de elecciones* a las *agencias de gobierno* con el propósito de exponer
sus programas, proyectos, logros, realizaciones, etc.

(⁵) Art. 1-001 de la Ley Núm. 1 de 13 de febrero de 1974.

(⁶) Aun cuando se varió un poco el texto, su contenido básico permaneció inalte-
rado. Se dispuso que:
"Artículo 8.001—Gastos de Difusión Pública del Gobierno.—
"Se prohíbe a las *agencias* del Gobierno de Puerto Rico, *que a partir del 1ro. de
enero del año en que deba celebrarse una elección general y hasta el día siguiente a la
fecha de celebración de la misma,* incurran en gastos para la compra de tiempo y
espacio en los medios de difusión pública *con el propósito de exponer sus programas,
proyectos, logros, realizaciones, proyecciones o planes.* Se exceptúan de esta dispo-
sición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
"Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean
utilizados para difundir información de interés público, urgencia o emergencia, los
cuales sólo serán permitidos previa autorización al efecto de la Junta Revisora
Electoral." (Énfasis suplido.)

A base de las experiencias sufridas en las elecciones generales de 1980, llega un momento en que *los partidos* políticos principales *entienden* —puesta su vista y atención en las elecciones generales a celebrarse en 1984— *que se debe legislar y aprobar una ley electoral enmendatoria de la anterior.*

En esta ocasión, sin embargo, la cosa es distinta: ya no domina un solo partido; *tiene que, por obligación, existir consenso.* Nuestros líderes políticos, aunando esfuerzos y poniendo el bienestar de Puerto Rico por encima de todo, se crecen. Trabajando por conducto de una comisión compuesta por distinguidos puertorriqueños se pudo lograr un acuerdo. Nace a la luz pública, *por unanimidad,* una "nueva" ley electoral, la Ley Núm. 3 de 10 de enero de 1983.

El Art. 8.001 de la Ley Electoral *vigente,* dispone:

> Se prohíbe a las *agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial,* que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (Énfasis suplido.)

Como podemos inmediatamente notar, en lo pertinente al caso ante nuestra consideración, hubo una sustancial, importante y extraordinaria enmienda: se incluye a la Asamblea Legislativa de Puerto Rico en la ejemplarizante prohibición contenida en el citado Art. 8.001 de la Ley Electoral.

En otras palabras, la *presente* y *actual* Asamblea Legislativa de Puerto Rico en ese proceso de negociación que

resultó en un acuerdo unánime y que desembocó en la aprobación de la citada Ley Núm. 3 de 10 de enero de 1983, *consintió expresa y explícitamente a ser fiscalizada* por la Comisión Estatal de Elecciones —*y, en última instancia, por los tribunales*— en cuanto a la utilización de fondos públicos durante año de elecciones generales en lo referente a la difusión de sus *programas, proyectos, logros, realizaciones, proyecciones o planes.*

II-*Los hechos específicos del caso*

El 8 de febrero de *1984*, el Señor Secretario del Senado de Puerto Rico, Lcdo. Hipólito Marcano, *a nombre y en representación de ese alto cuerpo* radicó ante la Comisión Estatal de Elecciones una "Solicitud de Autorización o Ratificación" —*de conformidad con el citado Art. 8.001 de la Ley Electoral*— para que se le autorizara el pagar con fondos públicos la televisación de unas vistas públicas a ser celebradas por la Comisión de lo Jurídico del Senado en relación con el *proyecto* de ley para crear el cargo de Fiscal Especial Independiente.[7]

El Presidente de la Comisión Estatal de Elecciones, Lcdo. César R. Vázquez Díaz, *actuando en calidad de oficial examinador de la referida Comisión*[8] denegó la solicitud de referencia. Resolvió, en síntesis, que la Comisión tenía "jurisdicción" sobre la Asamblea Legislativa en virtud de las disposiciones del citado Art. 8.001 de la Ley Electoral y que las vistas públicas en controversia no cumplían con la definición de "interés público" contenida en el Reglamento de Control de Gastos en los Medios de Difusión Pública emitida

---

[7] El Senado radicó originalmente el 8 de febrero de 1984 una solicitud y luego, el 13 de febrero de 1984, enmendó la misma. En la solicitud original expuso como único argumento a favor de su solicitud de autorización que dicho "asunto" debía ser exceptuado de la prohibición contenida en el citado Art. 8.001 de la ley por ser el mismo uno de "interés público". En la solicitud enmendada alegó, adicionalmente, que el prohibir las discusiones públicas de los actos legislativos constituía una ". . . restricción indebida de la función de la Asamblea Legislativa . . .".

[8] Práctica que, por las razones que surgirán más adelante, no es deseable ni aconsejable y que debe ser descontinuada.

por la Comisión, cuyo Reglamento tenía el propósito de evitar que los organismos gubernamentales, usando fondos públicos, realizaran "solapadamente campaña política".

Inconforme con la resolución emitida, el Senado de Puerto Rico por conducto de su Presidente, Hon. Miguel A. Hernández Agosto, radicó ante el pleno de la Comisión Estatal de Elecciones un escrito de apelación. Reprodujo, en síntesis, los argumentos que había esbozado en la solicitud de autorización enmendada que había radicado.

No habiendo unanimidad entre los señores comisionados electorales, por mandato de ley, le correspondió emitir el voto decisivo al señor presidente de la Comisión, Lcdo. César R. Vázquez Díaz. En esta ocasión, en su carácter de presidente, se revocó a sí mismo, en el carácter de oficial examinador.[9] Determinó que las vistas en controversia conllevaban "un interés público de tal naturaleza" que justificaban la autorización del uso de fondos públicos.

Con fecha de 5 de marzo de 1984, cinco ciudadanos de este país —en su capacidad de electores inscritos en el Estado Libre Asociado de Puerto Rico y como tales en su carácter de "parte afectada" en los derechos que le concede la Ley Electoral de Puerto Rico, en específico el Art. 2.002 de la misma— radicaron una petición ante el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, para revisar la Resolución de 22 de febrero de 1984 emitida por el señor presidente de la Comisión Estatal de Elecciones.

Mediante opinión y sentencia de fecha 16 de marzo de 1984, el honorable Tribunal Superior, Sala de San Juan —Hon. Wilfredo Alicea López, Juez— declaró sin lugar la referida petición, básicamente, por los siguientes dos fundamentos: que los cinco electores recurrentes no tenían capacidad jurídica para solicitar la revisión de la resolución emitida por la Comisión, y que el "uso de fondos públicos para la difusión televisada de las vistas no está prohibido por

---

[9] Mediante resolución al efecto de fecha 22 de febrero de 1984.

el Art. VI, Sec. 9 de nuestra Constitución porque dicha difusión persigue un fin público legítimo". [10]

Habiéndose radicado recurso de *certiorari* el 19 de marzo de 1984 para revisar dicha sentencia, este Tribunal ese mismo día emitió resolución negándose a revisar la misma. [11]

Así las cosas, el 21 de marzo de 1984 el Señor Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, presentó ante el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, una demanda sobre *injunction* preliminar, *injunction* permanente y sentencia declaratoria contra los Hons. Miguel Hernández Agosto y Francisco Aponte Pérez, Presidente del Senado de Puerto Rico y de la Comisión de lo Jurídico de dicho cuerpo, respectivamente. Solicitó del tribunal de instancia que dictara un *injunction* preliminar y permanente que prohibiera al Senado de Puerto Rico el utilizar fondos públicos para televisar las antes mencionadas vistas públicas y que dictara sentencia declaratoria que resolviera que ni el Senado ni su Comisión de lo Jurídico pueden utilizar fondos públicos con fines político-partidistas en violación de nuestra Constitución y del Art. 8.001 de la Ley Electoral. [12]

Señalada por el tribunal de instancia la vista sobre mostración de causa, dicho tribunal, en unión a los abogados de las partes, *tuvo la oportunidad de apreciar la grabación en "video-cassette" de la vista celebrada por la Comisión de lo*

---

[10] Señaló el tribunal de instancia, en adición, que los argumentos incoados por los electores resultaban ser prematuros y especulativos y que le era difícil a dicho tribunal determinar a priori con algún grado de certeza que el Senado de Puerto Rico iba a utilizar la transmisión televisada de las vistas para propósitos político-partidistas lo cual, según dicho tribunal, sí está taxativamente prohibido por el citado Art. 8.001 de la Ley Electoral.

[11] Con la intervención de los Señores Jueces, Honorables Trías Monge, Torres Rigual, Díaz Cruz, Irizarry Yunqué y Negrón García. El Honorable Juez Asociado Dávila se inhibió. El Juez suscribiente no participó.

[12] Senadores del Partido Nuevo Progresista y ciudadanos particulares radicaron demandas de intervención para solicitar remedios similares.

*Jurídico el día 20 de marzo de 1984,* en cuya vista, *según alegaba la parte demandante,* surgieron incidentes que demostraban que la parte demandada estaba haciendo propaganda de tipo político-partidista.

Con fecha de 23 de marzo de 1983 el tribunal de instancia —Hon. Wilfredo Alicea López, Juez— emitió una resolución y orden mediante la cual desestimó en todas sus partes la acción interdictal; "retuvo" la causa de acción como un pleito de sentencia declaratoria; y emitió una orden, al amparo de la Regla 56.5 de las de Procedimiento Civil, que prohibió *provisionalmente* el pago con fondos públicos de las vistas hasta que resolviera el caso.

Los demandados antes mencionados radicaron el 26 de marzo de 1984 ante este Tribunal una petición de *certiorari* en revisión de dicha resolución y orden en la que alegaron, en síntesis, que había errado el tribunal de instancia al "continuar con una acción civil de sentencia declaratoria contra los senadores demandados cuando la cuestión envuelta cae dentro del ámbito de una actividad legislativa legítima" y al "no reconocer el carácter absoluto de la inmunidad parlamentaria". Dicha parte demandada, en adición, mediante la radicación de una moción en auxilio de jurisdicción "solicitó" de este Tribunal (¹³) que emitiera una orden de suspensión de la resolución y orden del tribunal de instancia hasta que se determinara finalmente sobre la petición de *certiorari.*

Mediante resolución de fecha 27 de marzo de 1984, (¹⁴) este Tribunal concedió a la parte demandante recurrida un plazo "para que exprese lo que crea menester con respecto a lo solicitado". En adición, y en auxilio de la jurisdicción de este Tribunal, se dejó sin efecto la resolución y

---

(¹³) El párrafo quinto de la referida moción lee:

"5. También se exige que este Honorable Tribunal, en auxilio de su jurisdicción, emita una orden suspendiendo la Resolución y Orden del Tribunal de Instancia hasta que se determine finalmente sobre la petición de certiorari."

(¹⁴) Los Señores Jueces Asociados, Honorables Dávila y Negrón García se inhibieron. El Juez suscribiente no participó.

orden recurrida y se ordenó la paralización de los procedimientos en el tribunal de instancia. (15)

III–*La decisión emitida; sus efectos y consecuencias*

Una mayoría de este Tribunal, con la conclusión de que las disposiciones del citado Art. 8.001 de la Ley Electoral vigente no pueden entenderse "como un intento de convertir su *limitado objetivo* en la peligrosa disminución del histórico derecho [de las Asambleas Legislativas] a la inmunidad, en el cercenamiento de la función informativa parlamentaria y en una *cuestionable obligación judicial* de juzgar actuaciones legislativas *cuya evaluación le corresponde al electorado del país*" (énfasis suplido), revoca la resolución y orden emitida por el tribunal de instancia y ordena la desestimación de la demanda radicada.

Procede que analicemos por partes la antes transcrita conclusión:

A – La expresión respecto al supuesto *limitado objetivo* de la ley en controversia se basa en que la mayoría de este Tribunal ha "*escudriñado el historial legislativo* de la Ley Núm. 3 de 10 de enero de 1983" *y no encontró* "*indicación alguna* de que, al incluirse a la Asamblea Legislativa en la prohibición expuesta en el Art. 8.001, la *intención de ésta* fuese renunciar a parte sustancial de sus prerrogativas y abolir toda posibilidad de televisar sus procedimientos a menos que medie el consentimiento de la Comisión Estatal de Elecciones y de los tribunales . . .". (Énfasis suplido.)

De entrada, nos parece pertinente recordar y señalar las sabias palabras de este Tribunal, por voz del Hon. Carlos Santana Becerra, en *Rodríguez Rodríguez* v. *Gobernador*, 91 D.P.R. 101 (1964), a los efectos de que "la ley es la expresión de un propósito o fin deseado y querido" y que el "texto claro de la ley es la expresión por excelencia de la intención legis-

---

(15) Solicitada la reconsideración de dicha resolución, la misma fue declarada sin lugar. Posteriormente se permitió la intervención de los "interventores" a nivel de instancia.

lativa"; las del Hon. Juez Asociado Hutchinson en *Martínez v. Junta Insular de Elecciones*, 43 D.P.R. 413 (1932), a los efectos de que el "objeto y fin de toda interpretación estatutaria es determinar el significado del estatuto de que se trate. Cuando ese significado lo expresa la Legislatura misma en términos claros e inequívocos, no hay margen ni excusa para interpretaciones"; y las del compañero Juez Asociado, Hon. Hiram Torres Rigual, en *Famania v. Corp. Azucarera de P.R.*, 113 D.P.R. 654, 657–658 (1982), a los efectos de que nuestra "función es interpretar la ley y no juzgar su bondad o sabiduría. Por eso, *no debemos frustrar los propósitos de un estatuto* cuando la letra es clara y expresa sin ambigüedad la intención del legislador . . .". (Énfasis suplido.)

Las disposiciones del Art. 8.001 de la Ley Electoral vigente son claras e inequívocas. No hay necesidad de que persona alguna pierda su tiempo "escudriñando" su historial legislativo. La intención, propósitos y objetivos del legislador al originalmente crear dicho estatuto en el 1974, al mantenerlo en la nueva legislación de 1977, y al enmendarlo, para incluir a las ramas legislativa y judicial, en el 1983 son diáfanamente claros. Como bien expresara el Hon. Antonio Negrón García, Juez Asociado de este Tribunal, en la opinión disidente que emitiera en el caso de *P.P.D.* v. *Junta Revisora Electoral*, 109 D.P.R. 464, 467 (1980), *refiriéndose al Art. 8.001 según el mismo leía en el año 1977 cuando únicamente incluía a las agencias del Gobierno*:

> Plasma un *principio de alta moralidad en la administración pública* e intenta lograr los siguientes objetivos: (a) directamente, evitar que las agencias gubernamentales usando fondos públicos y so pretexto de exponer sus ejecutorias o planes, *realicen solapadamente campaña política* en favor del partido en el poder y aquellos incumbentes que aspiran nuevamente a ser electos; (b) *reducir las ventajas reconocidas que gozan los candidatos incumbentes* —a través del acceso a los electores y público en general por medio de la televisión, prensa y radio— que el solo ejercicio y exposición del cargo

conlleva sobre sus opositores; y (c) *indirectamente, frenar los excesos y economizar al erario público y a los contribuyentes los gastos ordinarios de publicidad en año de elecciones.* (Énfasis suplido.)

Como fundamento adicional del mal llamado "limitado objetivo" de la ley aquí en discusión, señala la mayoría de este Tribunal que no han "hallado jurisdicción alguna donde se detenga la transmisión directa de procedimientos legislativos por razón de que se trate de un año eleccionario o por estar presentes entre los legisladores candidatos a reelección . . .". Ello no es para que nadie se extrañe ni se sorprenda. En ninguna otra jurisdicción existe una disposición de ley similar a la del Art. 8.001 de la Ley Electoral vigente.

En relación con este aspecto, por último, y como surge de la relación de hechos que hiciéramos en la parte I de la presente ponencia, el Art. 8.001 según reza en la actualidad fue el producto o fruto *de un proceso encomiable de autolimitación por parte de nuestro gobierno.* Como todo procedimiento en que se toma la decisión de "recortar" o limitar "algo" a lo que tenemos derecho, el mismo fue lento pero, afortunadamente, efectivo, *culminando el mismo en un extraordinario principio de sana administración pública.* En el 1974 y 1977 la Rama Ejecutiva cedió. En el 1983, producto ello de conversaciones y negociaciones que culminaron en un acuerdo, la Rama Legislativa consintió en ser cubierta por dicha disposición legal.

Como para que no quedara duda en la mente de persona alguna de que la intención, objeto y propósito de la referida disposición legal *es impedir todo gasto de fondos públicos* durante año de elecciones(16) con el propósito de exponer programas, proyectos, planes, etc., *se incluyó a la Rama Judicial.* Nos parece que es forzosa la conclusión de que el "objetivo" de dicha medida no puede ser uno "limitado" como sostiene la mayoría de este Tribunal.

---

(16) Exceptuándose lo que esté revestido de interés público, etc.

B - *La inmunidad legislativa*

Dispone el Art. III, Sec. 14, de la Constitución del Estado Libre Asociado de Puerto Rico que:

Ningún miembro de la Asamblea Legislativa será arrestado mientras esté en sesión la cámara de la cual forme parte, ni durante los quince días anteriores o subsiguientes a cualquier sesión, excepto por traición, delito grave, o alteración de la paz; y todo *miembro* de la Asamblea Legislativa *gozará de inmunidad parlamentaria por sus votos y expresiones* en una u otra cámara o en cualquiera de sus comisiones. (Énfasis suplido.)

Nadie niega la sabiduría de dicha disposición constitucional. Tampoco se discute el hecho de que contra los señores legisladores no se podrán instar acciones legales —civiles o criminales— por lo que hagan o expresen en el desempeño de sus funciones como tales.

Ahora bien, el derecho a la inmunidad, no empece a ser constitucional, puede ser objeto de renuncia. Todo lo que se requiere es que la renuncia sea expresa, voluntaria e inteligentemente realizada y con conocimiento de las consecuencias. *Brady* v. *United States*, 397 U.S. 742, 748 (1970)(17); *Pagán Hernández* v. *Universidad de P.R.*, 107 D.P.R. 720 (1978); *Pueblo* v. *Morales Romero*, 100 D.P.R. 436 (1972).

El Tribunal Supremo de Estados Unidos de América en el caso de *Edelman* v. *Jordan*, 415 U.S. 651 (1974) —referente el mismo a si un estado había renunciado a su inmunidad a ser demandado— señaló, en lo pertinente, lo siguiente:

In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implication from the test as [will] leave no room for any other reasonable construction." *Murray* v. *Wil-*

---

(17) "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."

*son Distilling Co.*, 213 U.S. 151, 171 (1909). 53 L. Ed. 742; 29 S. Ct. 458. Pág. 673.

¿Puede argumentarse con validez jurídica que la *auto inclusión* de la presente y actual Asamblea Legislativa de Puerto Rico dentro de la prohibición contenida en el Art. 8.001 de la Ley Electoral no fue voluntaria, inteligente, expresa y con conocimiento de las consecuencias? ¿Debemos presumir, por el contrario, que dicha Asamblea Legislativa no sabía lo que estaba haciendo cuando aprobó dicha pieza legislativa?

Nos parece a nosotros que es obligatoria la conclusión de que la Asamblea Legislativa con motivo, como expresáramos anteriormente, de unas conversaciones y negociaciones que desembocaron en un acuerdo, renunciaron a la posible inmunidad de que gozan respecto a esta materia y consintieron expresa y explícitamente a ser *fiscalizados* por la Comisión Estatal de Elecciones —y por los tribunales— respecto a la prohibición contenida en el Art. 8.001 de la vigente Ley Electoral.[18]

C – *La función de los tribunales*

En *Peña Clos* v. *Cartagena Ortiz*, 114 D.P.R. 576, 591 (1983), expresó este Tribunal que la "tradición constitucional sostiene *el poder de la Rama Judicial* para determinar *la legalidad de los actos* de las Ramas Ejecutiva y Legislativa del Gobierno" *y que esto* "*significa* que ni los cuerpos y órganos legislativos ni los funcionarios ejecutivos pueden convertirse en jueces de sus propios poderes". (Énfasis suplido.) En *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 759 (1977) (Juez Trías Monge), se señala que la "Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos *y la determinación*

---

[18] La radicación por parte del Senado de Puerto Rico de la solicitud de autorización para transmitir las vistas en controversia constituye una "aceptación" por parte de dicho alto cuerpo de que le cobijan y obligan las disposiciones del citado Art. 8.001.

*de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales".* (Énfasis suplido.)

El tribunal de instancia —correcta o incorrectamente— originalmente resolvió que las vistas aquí en controversia podían ser costeadas con fondos pertenecientes al Pueblo de Puerto Rico por cuanto la difusión de las mismas perseguían un fin público legítimo.

Al serle planteado el problema por segunda vez —en esta ocasión con prueba *supuestamente* demostrativa de que las vistas habían sido utilizadas con propósito de hacer propaganda político-partidista— con gran juicio entendió que podía y debía, en vista de la jurisprudencia antes citada y dadas las expresas y claras disposiciones del citado Art. 8.001 de la Ley Electoral vigente, retener jurisdicción sobre el caso con el propósito de examinar y posteriormente determinar si la parte demandada efectivamente había ejercitado indebidamente o había convertido en ilegítimo aquello a que en sus comienzos tenía derecho.

La mayoría de este Tribunal, por voz del Juez Presidente Señor Trías Monge, expresó que la *"tarea de los tribunales* en el caso *de este género* de choque entre la Rama Ejecutiva y Legislativa del gobierno *se limita a indagar* si se trata de una *práctica legislativa legítima,* debidamente ligada a alguna de las funciones tradicionales de los parlamentos y sus integrantes dentro de un sistema de separación de poderes" (énfasis suplido), práctica cuya evaluación supuestamente "le corresponde al electorado del país" y no a los tribunales, y revocó la decisión emitida por el tribunal de instancia.

Presumiendo únicamente a los fines de la argumentación la corrección de dicha norma, la misma es inaplicable al presente caso en vista de los hechos particulares y específicos del mismo. A riesgo de ser repetitivos, nos vemos nuevamente obligados a expresar que la Asamblea Legislativa de Puerto Rico al aprobar el Art. 8.001 de la vigente Ley Electoral consintió a ser fiscalizada respecto a la materia que nos ocupa, tanto por la Comisión Estatal de Elecciones

como por los tribunales, al actuar éstos en revisión de las decisiones que emite dicho organismo administrativo. Ello está sostenido no tan sólo por los hechos expuestos en la parte primera de la presente ponencia sino que por el claro y expreso lenguaje a esos efectos del citado Art. 8.001. La conclusión, nos parece, no puede ser otra.

Examinados objetivamente los hechos del presente caso, la decisión que hoy emite este Tribunal constituye una abdicación de los poderes constitucionales de la Rama Judicial. Este Tribunal en el día de hoy le hace un "flaco servicio" al Pueblo de Puerto Rico. En lugar de preservar y fortalecer uno de los pocos logros que sobre sana administración y moral pública se ha conseguido, lo destruye. Al incorrectamente autolimitarse en sus poderes constitucionales, este Tribunal sentencia innecesariamente al Pueblo de Puerto Rico a continuar siendo víctima, posiblemente en forma cada día mayor, de una propaganda política desmedida, costeada la misma con fondos públicos.[19]

Por las razones expresadas, confirmaría la resolución y orden emitida por el tribunal de instancia en el presente caso.

---

[19] En cuanto al argumento específico de que las disposiciones del citado Art. 8.001 no son aplicables a los hechos particulares del caso por razón de que, *según la mayoría de este Tribunal*, lo que en realidad se prohíbe son "anuncios" y la televisión de unas vistas públicas sobre un proyecto de ley no constituye la difusión de proyecciones, planes, proyectos, etc., basta decir que el propio Senado de Puerto Rico, al radicar ante la Comisión la solicitud de autorización, así lo concedió y admitió.

El Tribunal aduce lo anterior en la penúltima página de la ponencia mayoritaria; ello tiene el efecto curioso de hacer total y completamente innecesario (*dictum*) todo el razonamiento que contienen las primeras veintidós (22) páginas de la opinión mayoritaria.