MANUEL E. VÉLEZ RAMÍREZ, ETC., demandante y apelado, v.
SEVERO A. COLBERG RAMÍREZ, ETC., demandados y ape-
lantes.

*Número: R-85-116*        *Resuelto:* 4 de diciembre de 1986

*Marcos A. Ramírez Lavandero,* de *Ramírez & Ramírez,* abogado de los apelantes; *Heriberto Torres Villanueva,* abogado del apelado.

El Juez Asociado Señor Hernández Denton emitió la opinión del Tribunal.

Este caso plantea una cuestión constitucional novel e importante sobre el alcance de la protección de la Cláusula de Inmunidad Parlamentaria de la Constitución de Puerto Rico cuando los legisladores toman decisiones relacionadas con el personal de la Asamblea Legislativa. Porque la controversia es de gran trascendencia para el trabajo de la Rama Legislativa, expedimos el recurso instado por los Presidentes de ambas cámaras. Revocamos al tribunal de instancia.

I

De un análisis de las determinaciones de hecho del tribunal de instancia se desprende que el Sr. Manuel E. Vélez Ramírez fue nombrado como Director de la Biblioteca de Servicios Legislativos el 20 de julio de 1977 por los presidentes del Senado y de la Cámara de Representantes, Hon. Luis A. Ferré y Hon. Ángel Viera Martínez. Aunque el puesto requería un grado de maestría en Ciencias Bibliotecarias, o en la alternativa, cinco (5) años de experiencia en labores bibliotecológicas, para la fecha de su nombramiento el señor Vélez solamente tenía un grado de Bachiller en Artes y no tenía experiencia previa en bibliotecología.

Antes de su nombramiento, el señor Vélez fue candidato a alcalde de Hormigueros por el Partido Nuevo Progresista.

Sustituyó en la Biblioteca de Servicios Legislativos a un bibliotecario con maestría y diecinueve (19) años de experiencia en el cargo.

El 19 de febrero de 1982, el Hon. Severo A. Colberg Ramírez, Presidente de la Cámara de Representantes, y el Hon. Sergio Peña Clos, Vicepresidente y entonces Presidente en funciones del Senado, ordenaron al Lcdo. Juan R. Melecio, Director de la Oficina de Servicios Legislativos, que separara al señor Vélez de su puesto. Este último demandó a los Presidentes de Cámara y Senado y al Vicepresidente del Senado. Alegó que fue despedido ilegalmente por razones político-partidistas. Los demandados alegaron que el despido se debió a que el demandante no cualificaba para el puesto, y en la alternativa, que aun cuando hubiera sido destituido por motivos político-partidistas, la actuación de los legisladores demandados al así hacerlo estaba cobijada bajo el manto de la inmunidad legislativa.

El Tribunal Superior no discutió el planteamiento de inmunidad. Encontró probado que el demandante no cualificaba para el cargo, pero que el motivo de su despido fue por razones político-partidistas. No ordenó su restitución al puesto, pero sí le concedió una compensación de $10,000 por los sufrimientos y angustias mentales y el equivalente en dinero a seis (6) meses de sueldo, sujeto a las deducciones correspondientes. Inconformes con la determinación del tribunal de instancia, los Presidentes del Senado y de la Cámara acudieron ante nos.

## II

¿Impide la doctrina de inmunidad parlamentaria que el demandante pueda obtener un remedio judicial? ¿Cuál es el alcance de la revisión judicial sobre las decisiones en materia de personal tomadas por un legislador?

■ Nuestra Cláusula de Inmunidad Parlamentaria fue adoptada basada en la experiencia norteamericana y en la cláusula similar contenida en la Constitución Federal, Art. I, Sec. 6. Por tal razón, en ocasiones las interpretaciones dadas por los tribunales federales son de utilidad para estudiar el alcance de nuestra cláusula siempre y cuando éstas se ajusten a nuestras realidades sociales y políticas y cumplan con los propósitos perseguidos por nuestra cláusula. *Romero Barceló* v. *Hernández Agosto*, 115 D.P.R. 368 (1984); *In re Rodríguez Torres*, 106 D.P.R. 698, 721 (1978).

La Sec. 14 del Art. III de la Constitución del E.L.A. dispone que:

> ... todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones.

■ Tan recientemente como en el año 1984, este Tribunal definió los contornos de esta inmunidad que la Constitución ha otorgado a los legisladores. *Romero Barceló* v. *Hernández Agosto*, supra. Su ámbito es amplio. Ibíd., pág. 379. Cubre toda actividad legislativa en el hemiciclo o en las comisiones, al menos incluye lo que ocurra en los procesos de deliberación, comunicación, investigación, e información y actos necesarios para el desarrollo del proceso legislativo.

■ Sin embargo, como todo derecho y todo poder, esta inmunidad no es absoluta. *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 764 (1977); *Hutchinson* v. *Proxmire*, 443 U.S. 111, 125–133 (1979); *Gravel* v. *United States*, 408 U.S. 606, 625 (1972); *Tenney* v. *Brandhove*, 341 U.S. 367, 376–377 (1951). Corresponde a los tribunales, y no al Poder Legislativo, definir sus contornos. *Romero Barceló* v. *Hernández Agosto*, supra.

El Tribunal Supremo de Estados Unidos nunca se ha enfrentado al problema ante nos. *Cf. Davis* v. *Passman*, 442

U.S. 228, 235–236 esc. 11, 249 (1979). No obstante, existen tres casos recientes de tribunales de apelaciones federales que nos sirven de fuente ilustrativa.

En *Walker* v. *Jones*, 733 F.2d 923 (1984), la directora de la cafetería del Congreso demandó al Presidente de la subcomisión de Servicios de la Cámara de Representantes y a su Director Ejecutivo porque la habían despedido alegadamente por ser mujer.

Al resolver que esta actuación no estaba protegida por la inmunidad parlamentaria, la Corte de Apelaciones entendió que las funciones de la directora de la cafetería no se podían definir como "labores que significativamente informan e influyen" en el proceso legislativo. (Traducción nuestra.) *Walker* v. *Jones*, supra, pág. 931.

En *Agromayor* v. *Colberg*, 738 F.2d 55, 59 (1984), se demandó al amparo de la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983,[1] al Presidente de la Cámara de Representantes de Puerto Rico porque no aprobó el nombramiento del demandante como ayudante de prensa del Representante Granados Navedo. Alegó el señor Agromayor que la actuación del señor Colberg estuvo predicada en un discrimen por razones políticas y étnicas. Al resolver que la actuación estaba cobijada por la inmunidad parlamentaria, la Corte de Apelaciones para el Primer Circuito concluyó de esta manera:

> Hasta el punto *que las funciones de un empleado sean esenciales al proceso legislativo,* sus cualificaciones, y por ende,

---

[1] Aunque este es un caso donde el tribunal federal lo que está interpretando es la inmunidad que el *Common Law* otorga a los legisladores estatales y no la que la Constitución le concede a los congresistas, el Tribunal Supremo federal reiteradamente ha establecido que los propósitos y alcances de ambas son similares. *Supreme Court of Va.* v. *Consumers Union,* 446 U.S. 719, 732 (1980); *Lake Country Estates* v. *Tahou Planning Agcy.*, 440 U.S. 391 (1979); *Tenney* v. *Brandhove,* 341 U.S. 361 (1951).

su adecuada selección, debe ser también esencial. (²) (Traducción y énfasis nuestros.)

Más adelante añadió, pág. 60, citando a *Gravel* v. *United States*, supra: "Un empleado que labore en 'el proceso deliberativo y comunicativo', debe ser de una importancia legislativa directa." (Traducción nuestra.) Resolvió que el puesto al cual el demandante aspiraba tenía un "insumo significativo" en el proceso legislativo y, por ende, al no emplearlo el señor Colberg estaba cobijado por la inmunidad. (³)

El caso más reciente, *Browning* v. *Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C.Cir. 1986), expone claramente la norma a regir en estas controversias. En *Browning* v. *Clerk*, supra, se alegaba que la expulsión de una *Official Reporter* del Congreso estuvo motivada por prejuicios raciales. La función primordial de la demandante era ser estenotipista de las vistas de una comisión congresional.

Al resumir y clarificar los dos escrutinios utilizados en *Walker* v. *Jones*, supra, dijo el tribunal en *Browning* v. *Clerk*, supra, pág. 928:

> Un escrutinio provee que la Cláusula de Inmunidad Parlamentaria aplicará cuando las funciones del empleado razonablemente se puedan describir "como trabajo que significativamente informa o influencia la formulación de nuestra legislación nacional". Este escrutinio sugiere que la inmunidad cobija las decisiones de personal cuando el empleado ofrece un "insumo significativo en . . . el proceso legislativo". El segundo escrutinio provee que la Inmunidad protegerá cualquier decisión relacionada con un empleado cuyas funcio-

---

(²) Véase *Hudson* v. *Burke*, 617 F. Supp. 1501, 1511 (D.C.Ill. 1985), donde al enfrentarse al problema de cuál es el alcance que la inmunidad del *Common Law* le ofrece a un funcionario municipal (de la ciudad de Chicago) cuando ejerce funciones legislativas, la Corte de Distrito federal adoptó la norma de *Agromayor* v. *Colberg*, 738 F.2d 55 (1984).

(³) El tribunal señaló que al aplicar o no la inmunidad los tribunales deben ser cuidadosos al inquirir sobre las funciones del empleado por cuanto dicha interferencia de por sí puede violar los principios de la cláusula.

nes son "peculiares al trabajo de un miembro del Congreso *qua* legislador", o, expresado de otra forma, "íntimamente cognada . . . al proceso legislativo". (Traducción nuestra y citas omitidas.)

Concluyó el tribunal en *Browning* v. *Clerk,* supra, pág. 929, que la función de la demandante, a saber, transcribir *verbatim* lo que se dice en el hemiciclo y en las comisiones para uso futuro por los legisladores estaba directamente relacionado e íntimamente cognado con el proceso legislativo. [4]

Por ende, si las funciones del empleado forman parte integrante del proceso legislativo, de tal forma que directamente asisten a los miembros del Congreso en el "desempeño de sus funciones", las decisiones de personal que los afectan son correspondientemente legislativas y están protegidas del escrutinio judicial. (Traducción nuestra.)

### III

Nos parece que los criterios adoptados por el Circuito del Distrito de Columbia satisfacen plenamente las aspiraciones que nuestra Cláusula de Inmunidad Parlamentaria pretende cobijar. *Romero Barceló* v. *Hernández Agosto,* supra. De esta forma se le facilita al legislador tomar libremente decisiones en áreas que afectan su desempeño como parlamentarista. Por otro lado, el legislador no estará inmune cuando su decisión esté relacionada con un empleado cuyas funciones no afecten el proceso legislativo.

■ Por lo tanto, resolvemos que en Puerto Rico para que la decisión de separar a una persona de su empleo en la Asamblea Legislativa esté protegida por la inmunidad parlamentaria, se tiene que satisfacer uno de los siguientes escrutinios:

---

[4] *Cf. Torres* v. *Grunkmeyer,* 601 F. Supp. 1043 (1985), donde se resolvió que la decisión de no emplear a un empleado de limpieza en la Cámara de Representantes estatal, alegadamente por razones políticas, no estaba protegida por la inmunidad parlamentaria.

que el empleado despedido desempeñe funciones que razonablemente se puedan describir como un trabajo en el que significativamente informa o influye en el proceso legislativo, o sea, que el empleado tenga un "insumo significativo" en dicho proceso legislativo; o en la alternativa, que las funciones del empleado sean esenciales a los trabajos legislativos. *Walker* v. *Jones*, supra; *Agromayor* v. *Colberg*, supra; *Browning* v. *Clerk*, supra.

## IV

Debemos, pues, analizar los objetivos de la Biblioteca Legislativa y las tareas de su director para conocer cuál es el rol que éste desempeña en el proceso legislativo puertorriqueño.

La Biblioteca de Servicios Legislativos, tal y como existe hoy día, fue creada por la Ley Núm. 59 de 19 de junio de 1964. [5] No obstante, sus orígenes datan de 1923. Su creación, desarrollo y evolución ha estado íntimamente relacionada con la deseabilidad de asegurarle a los miembros de la Asamblea Legislativa los mejores y más eficientes servicios técnicos para que les asistan en el desempeño de sus funciones. J. Trías Monge, *Legislative and Judicial Reorganization in Puerto Rico* (tesis inédita), Universidad de Yale, 1947, págs. 35–41, 317–329.

En 1923 se aprobó la "Ley estableciendo la Biblioteca del Capitolio y proveyendo para el sostenimiento y régimen de la misma". [6] En 1946 esta ley fue derogada y se proveyó nuevamente para la creación de la "Biblioteca del Capitolio". [7]

---

[5] 1964 Leyes de Puerto Rico 170.

[6] Ley Núm. 28 de 6 de julio de 1923, Leyes de Puerto Rico 231. En su Art. 2 esta ley disponía que "el gobierno y administración de la biblioteca, . . . estarán a cargo de una comisión conjunta", compuesta por tres representantes y tres senadores. Éstos tenían la responsabilidad de escoger un bibliotecario para dirigirla.

[7] Ley Núm. 390 de 22 de abril de 1946, Leyes de Puerto Rico 1059.

El Art. 2 de dicha ley disponía que la dirección y administración de la biblioteca estaría a cargo de un bibliotecario. Entre las funciones de éste se encontraban las de *prestar cooperación a los miembros de la Asamblea Legislativa y asegurarse de que la biblioteca le rindiera a éstos el "máximo servicio".* [8]

En 1947 se creó la Oficina de Consultas Legislativas [9] que tenía la responsabilidad de ofrecerle a los miembros de la Asamblea Legislativa servicios de redacción de proyectos y otros documentos legislativos, servicios de consultas legales e investigación de problemas legislativos y *servicios de biblioteca.* [10]

A través de la creación de la Oficina de Consultas Legislativas se intentó comenzar a suplirle a la Asamblea Legislativa los servicios técnicos necesarios para desempeñar adecuadamente sus funciones. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 139. Aunque su personal y facilidades eran muy limitadas, no hay dudas de que ayudó efectivamente a mejorar la calidad del proceso legislativo en Puerto Rico. [11] No obstante, al seleccionarse el primer gobernador electo en Puerto Rico, la gran parte del personal de la oficina pasó a La Fortaleza, y quedó la Asamblea Legislativa nuevamente huérfana de tan importante herramienta. Ibíd., págs. 139–140; R. Serrano Geyls, *Executive-Legislative Relationships in the Government of Puerto Rico, 1900–1954*, 14 Rev. Jur. U.I.A. 11, 48 (1979); Escuela de Administración Pública, *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1952, págs. 358–359.

---

[8] Ibíd., Art. 3.

[9] Ley Núm. 397 de 13 de mayo de 1947, Leyes de Puerto Rico 761.

[10] Ibíd., Art. 2.

[11] La Oficina de Consultas Legislativas estuvo dirigida por los distinguidos puertorriqueños Marco A. Rigau, Carlos V. Dávila y Alberto Ferrer.

Las Leyes Núm. 362 de 8 de mayo de 1951, ([12]) Núm. 3 de 1ro de mayo de 1952 ([13]) y Núm. 46 de 10 de junio de 1953 ([14]) dispusieron para la creación de una Comisión Conjunta de ambos cuerpos que estudiara el funcionamiento de la Asamblea Legislativa y diseñara mecanismos para hacerla más eficaz. La Escuela de Administración Pública de la Universidad de Chicago colaboró intensamente en los estudios realizados por la Comisión Conjunta. Serrano Geyls, *op. cit.*, pág. 24. Como resultado directo de estos estudios la Comisión aprobó una resolución el 27 de enero de 1954 en virtud de la cual se creó la Oficina de Servicios Legislativos del Estado Libre Asociado. ([15]) La oficina continúa laborando al presente.

Una vez establecida la Oficina de Servicios Legislativos, en 1964 se creó la Biblioteca Legislativa adscrita a dicha oficina. ([16]) Esta ley, según enmendada, ([17]) es la que actualmente rige el funcionamiento de la Biblioteca Legislativa. Sus disposiciones así como la exposición de motivos arrojan luz sobre la importancia de la Biblioteca para el funcionamiento de la Asamblea Legislativa.

La exposición de motivos de la ley habilitadora de la Biblioteca establece, entre otras cosas, que el legislador puertorriqueño "necesita y tiene derecho a un servicio de consulta e información centralizado". Se reconoce que una biblioteca general es "una de las mejores puertas de rápida información y ayuda para el legislador". Al enmendarse la ley en 1981 para disponer en su Sec. 7 que "todos los estudios, informes,

---

([12]) 1951 Leyes de Puerto Rico 855.

([13]) 1952 Leyes de Puerto Rico 5.

([14]) 1953 Leyes de Puerto Rico III.

([15]) Por haberse tornado académica la Ley Núm. 397 de 1947 que creó la Oficina de Consultas Legislativas, ésta se derogó mediante la Ley Núm. 67 de 20 de junio de 1956, Leyes de Puerto Rico 287.

([16]) Ley Núm. 59 de 19 de junio de 1964, Leyes de Puerto Rico 170.

([17]) Ley Núm. 78 de 6 de junio de 1968, Leyes de Puerto Rico 138; Ley Núm. 8 de 27 de mayo de 1981, Leyes de Puerto Rico 18.

expedientes y documentos recopilados durante el cuatrienio por las comisiones permanentes y especiales" de ambos cuerpos se remitan a la Biblioteca, ([18]) el legislador en la exposición de motivos expresó que la Biblioteca *"facilita la función de hacer las leyes* y permite que se encuentren soluciones a los muchos problemas de los que a diario confrontamos". (Énfasis nuestro.)

La ley dispone, entre otras cosas, que la Biblioteca tiene que estar "convenientemente accesible a los miembros de ambas Cámaras", ([19]) y que su uso se regirá por un reglamento aprobado por los Presidentes de ambos cuerpos. ([20])

## V

■ No debe haber dudas de que la Biblioteca Legislativa rinde servicios esenciales a la Asamblea Legislativa. Desde sus orígenes se le ha visualizado como un ente necesario y útil para el desempeño de las funciones legislativas. Forma parte integrante de la Oficina de Servicios Legislativos, brazo técnico-asesor de la Rama Legislativa.

El director de la Biblioteca Legislativa desempeña funciones que razonablemente se pueden describir como trabajo que significativamente *informa* o influye en el proceso legislativo. Más aún, las funciones de la Biblioteca Legislativa y las de su director son esenciales para el trabajo que realizan los legisladores. *Walker* v. *Jones,* supra; *Agromayor* v. *Colberg,* supra; *Browning* v. *Clerk,* supra. ([21])

---

([18])2 L.P.R.A. sec. 427.

([19])2 L.P.R.A. sec. 422.

([20])2 L.P.R.A. sec. 425.

([21])En *Lasa* v. *Colberg,* 622 F. Supp. 557, 560 (D.C. Puerto Rico 1985), la Corte federal para el Distrito de Puerto Rico resolvió que los Presidentes del Senado y de la Cámara de Puerto Rico estaban cobijados por la inmunidad parlamentaria del *Common Law* en acciones bajo Ley de Derechos Civiles federal, 42 U.S.C. sec. 1983, al despedir al Superintendente del Capitolio. Resolvió el tribunal que el Superintendente del Capitolio ocupaba una posición de "insumo significativo" en el proceso legislativo. Si se

Las actuaciones de los Presidentes de ambos cuerpos al separar al demandante de su puesto como Director de la Biblioteca Legislativa están cobijadas por la inmunidad parlamentaria que ofrece la Sec. 14 del Art. III de nuestra Constitución y, por lo tanto, sus actuaciones están exentas del escrutinio judicial.

Estamos conscientes del conflicto que existe entre los derechos constitucionales del demandante, alegadamente violados, y nuestro esquema de separación de poderes protegidos por la Cláusula de Inmunidad Parlamentaria. Los redactores de nuestra Constitución estaban conscientes de los riesgos inherentes a la concesión de la inmunidad. Trías Monge, *Historia Constitucional, op. cit.,* Vol. III, pág. 156; Serrano Geyls, *op. cit.,* págs. 373–378. No obstante, optaron por asegurar al legislador en el desempeño de sus funciones una amplia libertad de acción, de forma tal que sus actuaciones redundaran en beneficio para el pueblo.

Concluimos, por lo tanto, que erró el tribunal de instancia al ordenar a los Presidentes del Senado y de la Cámara que compensaran al demandante por alegados daños sufridos por éste como consecuencia de las actuaciones de aquéllos.

*Se revocará la sentencia dictada.*

---

comparan las funciones de la Superintendencia del Capitolio, 2 L.P.R.A. sec. 651 *et seq.,* con las de la Biblioteca se puede notar que la segunda influye mucho más que la primera en el proceso legislativo puertorriqueño.