*420 Opinión de conformidad emitida por la
Jueza Asociada Se-ñora Eiol Matta,
a la cual se une el Juez Asociado Señor Rebollo López.
A pesar de que estoy conforme con el resultado que acordó la Mayoría de este Tribunal, entiendo que no debe-mos pasar por alto la oportunidad que nos brinda el re-curso que hoy examinamos para delinear el alcance de la facultad de la Rama Legislativa para requerir a la Rama Ejecutiva información cuya confidencialidad está dis-puesta por una ley y para aclarar la trayectoria jurispru-dencial que se ha ido foijando en este tema. Me parece particularmente importante determinar el análisis jurídico que aplica a una controversia como la de autos, luego de lo resuelto en Peña Clos v. Cartagena Ortiz, 114 D.RR. 576, 591 (1983). Este caso también presenta una oportunidad para esbozar algunos de los requisitos con los cuales debe cumplir todo requerimiento de información efectuado por el Estado, particularmente cuando se afectan derechos ciu-dadanos fundamentales.
I
Es harto conocido que la función de ser intérprete final de la Constitución le corresponde exclusivamente al Poder Judicial. En nuestra jurisprudencia hemos reitérado que, aun cuando la Constitución le atribuye ciertas potestades al Poder Legislativo y al Ejecutivo, la definición de sus contornos y la determinación de la validez de su ejecución representan de por sí un delicado ejercicio de interpreta-ción constitucional reservado por nuestra tradición jurí-dica a los tribunales. Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 516 (1994); Santa Aponte v. Srio. del Senado, 105 D.P.R. 750, 759-760 (1977). Esto significa que ni los *421 cuerpos y órganos legislativos ni los funcionarios ejecutivos pueden convertirse en árbitros de sus propios poderes. No le corresponde al Ejecutivo ni a la Asamblea Legislativa determinar en este caso qué información es divulgable o no, pues los tribunales son los intérpretes finales de las leyes y de la Constitución. Rullán v. Fas Alzamora, 166 D.P.R. (2006); Peña Clos v. Cartagena Ortiz, supra, pág. 591. Hemos explicado que “[t]al principio no prejuzga la amplitud o estrechez de determinada facultad legislativa o ■ ejecutiva y el grado de escrutinio judicial a que debe sujetársele”. Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 387 (1984). Más bien, la determinación de la amplitud o la estrechez de cierta facultad gubernamental, y el análisis constitucional que proceda, queda sujeto a un análisis ponderado de las controversias planteadas caso por caso. Como antesala a nuestra adjudicación, procede-mos a exponer el origen, la naturaleza y los fines del poder investigativo de la Asamblea Legislativa.
De acuerdo con el Preámbulo de nuestra Constitución, un sistema democrático es “aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas”. Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 251. Más allá de las consideraciones filosóficas, el funcio-namiento de un sistema que lleve el calificativo “democrá-tico” debe poseer una transparencia tal, en cuanto a su engranaje y ejecutoria, que permita el libre flujo de la in-formación necesaria para la integración del ciudadano con la cosa pública.
Los parlamentos democráticos tienen el deber de llevar a cabo su encomienda legislativa de la manera más cónsona con la réalidad social. Dentro de un sistema tripartita, en el que la Asamblea Legislativa lleva el peso de la representa-ción ciudadana, la relación entre los acontecimientos socia-les y la ley requiere un cómodo espacio de existencia *422 dialógica. Por tal razón es imperativa la defensa de amplias capacidades investigativas que permitan la más estrecha relación entre la realidad legislada y la vivida.
Como explicamos en Peña Clos v. Cartagena Ortiz, supra, los orígenes del poder de un cuerpo legislador y sus órganos para efectuar investigaciones se remontan al Parlamento inglés del siglo XVI.(1) El poder de investigación que poseen los parlamentos democráticos ha sido recono-cido por el Tribunal Supremo de Estados Unidos como un elemento necesario para ejecutar el poder de hacer leyes. La jurisprudencia del Tribunal Supremo federal ha resal-tado consistentemente los beneficios de un cuerpo legisla-tivo que posea la libertad necesaria para el mejor desem-peño de su encargo constitucional.(2)
La Rama Legislativa requiere la potestad de indagar, no sólo con el fin de aprobar legislación, sino para cumplir con la función que le corresponde en el sistema de pesos y con-trapesos que mantiene el balance del poder en un sistema de gobierno republicano como el nuestro, fundamentado en la separación tripartita de poderes.(3) La potestad de la Asamblea Legislativa para fiscalizar al Gobierno es amplia *423 e incluye la capacidad de buscar cualquier defecto en los sistemas sociales, económicos y políticos imperantes, de manera que puedan remediarse mediante legislación o por su mera divulgación. Este poder comprende el de indagar en los distintos departamentos del gobierno para exponer alguna ineficiencia, el posible desperdicio de recursos e in-cluso actos de corrupción. Watkins v. United States, 354 U.S. 178 (1957).(4)
En Puerto Rico hemos sido enfáticos en resolver que ne-garle a la Asamblea Legislativa poderes para compene-trarse de los hechos, “equivale al absurdo de exigirle que proporcione remedios necesarios en la oscuridad”. Banco Popular, Liquidador v. Corte, 63 D.P.R. 66, 79-80 (1944). Véase Pres. del Senado, 148 D.P.R. 737, 761-762 (1999).(5) A partir de la Constitución del Estado Libre Asociado (ELA), el poder parlamentario de investigación siguió considerán-dose, por lo tanto, como un poder inherente al Poder Legislativo. Rullán v. Alzamora, supra; H.M.C.A. (P.R.), Inc., etc. v. Contralor, 133 D.P.R. 945, 964 esc. 12 (1993).
Las Secciones 1 y 17 del Artículo III de nuestro texto constitucional, L.P.R.A., Tomo 1,(6) “representan la fuentes *424 nominales, pero en el fondo persiste el concepto de que la facultad de investigar es parte inseparable de la de legislar”. Peña Clos v. Cartagena Ortiz, supra, pág. 590; Pres, del Senado, supra, págs. 761-762. La facultad y el deber de la Asamblea Legislativa de fiscalizar la ejecución de la política pública y la conducta de los jefes de departa-mento, mediante el ejercicio de sus poderes de investiga-ción, fueron reconocidos por este Tribunal en Romero Barceló v. Hernández Agosto, supra, pág. 374. Allí estable-cimos que los poderes de formular leyes, fiscalizar al Go-bierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública provienen del pro-pio concepto de un gobierno divido en tres poderes coordi-nados, independientes y de idéntico rango. Concluimos, además, que dichas potestades no están subordinadas a la de legislación, pues contienen en sí su propia justificación, en cuanto contribuyen al desempeño del papel constitucio-nal de una asamblea representativa. A fin de cuentas, la Asamblea Legislativa es la institución forjadora de las le-yes y la política pública que rige el destino del Pueblo. Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).
La facultad investigativa y fiscalizadora de la Asamblea Legislativa se ejerce, de ordinario, a través de sus comisio-nes, a las que la Convención Constituyente calificó como el “corazón del cuerpo legislativo”. Silva v. Hernández Agosto, 118 D.P.R. 45, 66 (1986). A pesar de que nuestra Constitu-ción no define lo que constituye una comisión legislativa, este Tribunal ha entendido que la Sección 9 del Artículo III, L.P.R.A., Tomo 1, ed. 1999, pág. 371, donde se establece que “[c]ada cámara adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno”, faculta al Poder Legislativo a crear comisiones y delimitar su jurisdicción y facultades. También hemos expresado que la Sección 17 del Artículo III de nuestro texto constitucio-nal, Const. E.L.A., supra, pág. 378, elevó a rango constitu- *425 cional la existencia de las comisiones legislativas, al dispo-ner que:
Ningún proyecto de ley se convertirá en ley, a menos que se imprima, se lea, se remita a comisión y ésta lo devuelva con un informe escrito ... la cámara correspondiente podrá descárgar a la comisión del estudio e informe de cualquier proyecto y proceder a la consideración del mismo.(7)
En Silva v. Hernández Agosto, supra, reconocimos que las comisiones han facilitado y hecho más eficaces lás la-bores fiscálizadoras de la Rama Legislativa, agilizado el flujo de las ideas provenientes de la comunidad y promo-vido el proceso de negociación interna.
En aras de promover y hacer viable el poder investiga-tivo, el Código Político de 1902, según enmendado, incor-poró estatutariamente la facultad investigativa de la Asamblea Legislativa en su Artículo 31 (2 L.P.R.A. see. 151), que expone:
(a) Toda citación requiriendo a un testigo para que compa-rezca ante la Asamblea Legislativa, la Cámara de Represen-tantes, el Senado, o una comisión o subcomisión de cualquiera de dichos cuerpos, o una comisión o subcomisión conjunta de ambos cuerpos, con el propósito de declarar, o de producir o entregar documentos u objetos, o para ambas cosas, podrá ser expedida por el Presidente del Senado, el de la Cámara o el de la comisión o subcomisión ante la cual se desea que compa-rezca el testigo y al efecto bastará que:
(1) Se precise en ella si el acto ha de tener lugar ante la Asamblea Legislativa, la Cámara de Representantes, el Se-nado, una comisión o subcomisión conjunta de ambos cuerpos, una comisión o subcomisión de la Cámara o del Senado.
(2) Váya dirigidá al testigo.
(3). Se requiera que dicho testigo comparezca en el día, hora y lugar determinados y, en caso necesario, se requieran los documentos u objetos interesados.
*426 (4) Lleve la firma del Presidente del Senado, de la Cá-mara de Representantes o del Presidente de una comisión o subcomisión.
(b) El Presidente de cualquier comisión o subcomisión del Senado o de la Cámara de Representantes o de una comisión o subcomisión conjunta de ambos cuerpos, podrá expedir una citación requiriendo a un testigo para que comparezca ante un oficial investigador a declarar o a producir o entregar docu-mentos u objetos o para ambas cosas, siempre y cuando se cumpla con los siguientes requisitos:
(1) Que la investigación que se está llevando a cabo y dentro de la cual se hace la citación, haya sido ordenada me-diante resolución del cuerpo o mediante resolución concu-
■ rrente de ambos cuerpos y que la resolución especifique que la Comisión podrá emitir citaciones para que un testigo compa-rezca a declarar o a presentar documentos u objetos, o ambas cosas, ante un oficial investigador.
(2) La citación cumple con todos los requisitos menciona-dos en esta sección. 2 L.P.R.A. see. 151.
Por su parte, en cuanto a las órdenes de citación que puede emitir la Comisión, la Sección 5.20 del Reglamento de la Comisión de Bienestar Social establece que:
El Presidente de la Comisión tendrá facultad de expedir ór-denes de citación a cualquier persona para que comparezca a contestar preguntas o a suministrar la información que la Co-misión puede requerir al estudiar cualquier asunto o medida que le haya sido sometida. Dichas citaciones serán firmadas por el Presidente y podrán ser dirigidas al (la) Sargento de Armas para su diligenciamiento.
Como explicamos en Banco Popular, Liquidador v. Corte, supra, el desarrollo de las doctrinas jurisprudencia-les sobre el poder investigativo de la Asamblea Legislativa está íntimamente ligado a las controversias sobre su poder de castigar por desacato. En Estados Unidos el poder de la Rama Legislativa de condenar por desacato civil, como me-canismo para asegurarse de recibir cierta información ne-cesaria, ha sido tratado como atributo esencial de los pode-res conferidos constitucionalmente a dicha Rama. McGrain v. Daugherty, 273 U.S. 135 (1927). Se ha entendido que sin *427 el poder de investigación, acompañado del poder de compe-ler a los testigos a emitir testimonio, la Rama Legislativa se podría ver seriamente truncada en el ejercicio sabio y efectivo de sus funciones constitucionales. Quinn v. United States, supra.(8)
En nuestra jurisdicción, somos concientes de que el ejer-cicio de esos poderes “depende grandemente de la facultad que tienen los cuerpos y comisiones legislativas de citar testigos a comparecer y a traer los documentos pertinentes a las vistas convocadas al amparo de una delegación auto-rizada por el cuerpo correspondiente”. Hernández Agosto v. Betancourt, 118 D.P.R. 79, 84 (1986). Por esa razón, repe-tidamente hemos convalidado los poderes investigativos de las comisiones y su facultad de citar testigos so pena de desacato. Hernández Agosto v. Betancourt, supra; Silva v. Hernández Agosto, supra; Pueblo v. Pérez Casillas, 117 D.P.R. 380 (1986); Peña Clos v. Cartagena Ortiz, supra.
El Código Político, según enmendado, provee en sus Ar-tículos 34 y 34-A (2 L.P.R.A. sees. 154 y 154(a)) dos proce-dimientos que tienen disponibles cualquiera de las Cáma-ras Legislativas para recurrir a los tribunales a vindicar su autoridad y ordenar la comparecencia de un testigo que se ha negado a declarar o a producir los documentos requeridos. Mediante el citado Artículo 34, luego de que los testigos hayan incumplido con las citaciones, el Presidente o Vicepresidente de la Cámara correspondiente tiene que someter al Secretario de Justicia una certificación con una relación de hechos que explique lo sucedido. Le corres-ponde al Secretario de Justicia formular acusaciones crimi-nales contra esas personas por negarse a asistir, testificar o presentar evidencia. Rullán v. Fas Alzamora, supra; Pueblo v. Pérez Casillas, supra.
Por otro lado, el Artículo 34-A, supra, permite que am- *428 bos cuerpos acudan directamente a los tribunales para re-querir la asistencia y la declaración de los testigos y la producción y entrega de los documentos solicitados. Una vez se presenta la petición, el Tribunal expide una citación para requerir y ordenar la comparecencia de los testigos con los documentos solicitados. Si se desobedece la orden, el tribunal considerará el asunto como un desacato civil. Antes de declarar incurso en desacato a un testigo que se ha negado a comparecer a la Asamblea Legislativa, el tribunal tiene que ofrecerle una oportunidad adecuada para defenderse. A esos efectos se celebrará una vista en la que el testigo podrá presentar todas las cuestiones constitucio-nales, legales y de hecho que estimare pertinentes. Pres. del Senado, supra; Hernández Agosto v. Betancourt, supra.
1 — l h-d
En esta ocasión, la Cámara de Representantes ha recu-rrido al citado Artículo 34-A para solicitar a los tribunales que se ordene el cumplimiento con los subpoenas duces te-cum cursados por su Comisión de Bienestar Social a los Departamentos de Justicia y de la Familia. Al examinar su solicitud, no podemos obviar que, no obstante la amplitud que se ha reconocido al poder inquisitivo de la Asamblea Legislativa, dicho poder está sujeto a los límites que este Tribunal vaya señalando al interpretar la Constitución. No podemos abdicar nuestro rol como árbitro final de la Cons-titución y guardián constitucional de los derechos de los ciudadanos. De esa encomienda partimos, no sin antes re-conocer que nuestra gestión en tan delicada tarea tampoco es absoluta, pues está regida por consideraciones jurídicas estrictas.(9)
*429 En Pres, del Senado, supra, indicamos que el tema de las investigaciones legislativas es., para el Poder Judicial, un área “sensitiva”. Jurisprudencialmente se observa una tendencia a proceder cautelosamente en este tipo de caso. En varias decisiones se aconseja vigorosamente la absten-ción judicial hasta tanto la intervención sea ineludible; antes, nuestro deber es abstenernos de definir los límites de los poderes legislativos.(10) Se ha establecido que, aun cuando no existe una prohibición absoluta a la revisión judicial de los procedimientos legislativos, ello no significa que los tribunales tengan la obligación de intervenir cada vez que se les presenta alguna controversia relacionada con estos procesos. En otras palabras, hay que distinguir entre la existencia del poder para intervenir y cuándo es prudente ejercerlo. El ejercicio de nuestra facultad inter-pretativa en materia de los poderes legislativos es impera-tiva cuando las actuaciones de otras ramas presenten cla-ros problemas respecto a su constitucionalidad. Acevedo Vilá v. Meléndez, 164 D.P.R. 875 (2005).
Nuestra incursión en este tema debe tener como pre-misa que el alcance del poder de investigación de la Rama Legislativa es tan amplio y penetrante como su potencial para promulgar leyes.(11) Es decir, dicho poder goza de la misma presunción de razonabilidad de todo acto legisla-tivo, pero sus límites son aquellos dispuestos en la Consti-tución a toda acción estatal, bien por la doctrina de sepa-ración de poderes(12) o por los confines que impone la Carta de Derechos.(13) Acevedo Vilá v. Meléndez, supra. Por ello, la autoridad investigativa de la Asamblea Legislativa no debe estar sujeta a la intervención de los tribunales a me- *430 nos que se ejerza de manera arbitraria, infringiendo una de estas dos limitaciones constitucionales que se le impo-nen a todas las ramas del Gobierno. Peña Clos v. Cartagena Ortiz, supra; Rullán v. Fas Alzamora, supra.(14)
A los fines de determinar si un cuerpo legislativo se ha extralimitado en el ejercicio de su poder de investigación, adoptamos en Peña Clos v. Cartagena Ortiz, supra, la dis-tinción que ha elaborado la jurisprudencia estadounidense entre las investigaciones legislativas dirigidas a individuos y las dirigidas a funcionarios o departamentos guberna-mentales, según la cual, cuando el choque surge entre las Ramas Legislativa y Ejecutiva, y no entre aquella y ciuda-danos particulares, la Rama Judicial debe actuar con especial mesura.(15) El criterio tradicionalmente empleado por los tribunales en esos casos es el de la razonabilidad. Este análisis requiere inquirir sobre varios extremos particula-res para determinar si se ha usado ese poder de manera arbitraria. Estos son: si la comisión o la cámara legislativa tiene jurisdicción para ejercer dicho poder; si persigue un propósito de naturaleza legislativa, y si la utilización de ese poder conlleva la invasión de alguna prerrogativa con-sagrada en la carta de derechos.
Sin embargo, en Peña Clos v. Cartagena Ortiz, supra, ante una alegación de confidencialidad, no nos ceñimos al método tradicional que hemos expuesto, anteriormente, sino que utilizamos también el método de sopesar intere-ses, para determinar la validez de unos subpoenas legislativos.(16) En aquella ocasión, ambos análisis nos lle- *431 varón a la misma conclusión jurídica, pero nunca aclara-mos cuándo debe utilizarse uno u otro método.(17) Las cir-cunstancias de este caso nos presentan la oportunidad de precisar el método de análisis constitucional que debemos aplicar cuando la Rama Legislativa solicita información custodiada por la Rama Ejecutiva y que es confidencial por disposición de ley.
Como expresamos en Peña Clos v. Cartagena Ortiz, supra, pág. 598, dentro de nuestro sistema constitucional, la Rama Ejecutiva no es
... el único guardián de la confidencialidad de los secretos del Estado. De ahí que para evitar la invocación espuria del privilegio, se acostumbre legislar para especificar su exten-sión, sujeto a la determinación final de los tribunales.
Este tipo de legislación, que indica las condiciones en que determinada información en poder del Estado es con-fidencial, es de vital importancia, ya que ayuda a evitar que se sustraiga del escrutinio publico información a la que tiene derecho la ciudadanía en un sistema democrático. Ya hemos expresado que “ [h] oy día se reconoce que el medio más efectivo de salvaguardar información sensitiva recopi-lada por el Estado en su gestión oficial, cuya divulgación pudiera lesionar el interés público, es mediante legislación especial”. Santiago v. Bobb y El Mundo, Inc., 117 D.RR. 153, 160 (1986). Véase E. Rivera Ramos, La libertad de información: necesidad de su reglamentación en Puerto Rico, 44 Rev. Jur. U.P.R. 67 (1975).
En Angueira v. J.L.B.P, 150 D.P.R. 10, 24-25 (2000), una ley establecía la confidencialidad de la información gu-bernamental que la ciudadana reclamaba. Allí reiteramos la norma general que configuramos en Santiago v. Bobb y El Mundo, Inc., supra, pág. 159, a los efectos de que los reclamos de confidencialidad por parte del Estado sólo pue- *432 den prosperar si éste prueba de forma precisa e inequívoca cualquiera de los siguientes supuestos: (1) que una ley de-clara la confidencialidad; (2) que la comunicación está pro-tegida por alguno de los privilegios evidenciarios que pue-den invocar los ciudadanos; (3) que revelar la información puede lesionar los derechos fundamentales de terceros; (4) que se trata de la identidad de un confidente, o (5) que es información oficial conforme a la Regla 31 de Evidencia, supra. De acuerdo con la doctrina constitucional impe-rante, en ese caso establecimos que, en nuestro ordena-miento, el análisis judicial requerido ante un reclamo de confidencialidad dependerá de cuál de estas excepciones a la divulgación invoque el Gobierno. Al confrontar el dere-cho fundamental de la reclamante al acceso a la informa-ción —que es reconocido corolario del derecho a la libertad de expresión— con la ley en controversia, reafirmamos lo que años antes habíamos resuelto en Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982), y procedimos a analizar la ley bajo un escrutinio estricto.
Más recientemente, en Colón Cabrera v. Caribbean Petroleum, 170 D.P.R. 582 (2007), resolvimos otra controver-sia entre el reclamo del acceso a la información guberna-mental por parte de unos individuos y una ley que establecía la confidencialidad de la información requerida. En esa ocasión quedó resuelto que al adoptar una ley de tal naturaleza, el legislador realiza un balance previo entre los intereses en conflicto: por un lado, el acceso a informa-ción por un ciudadano, y por el otro, el interés del Estado en que determinada información permanezca fuera del es-crutinio público.(18)
*433 Ahora bien, si una ley clasifica como confidencial cierta información del Ejecutivo y el reclamo de acceso a ésta se fundamenta en un derecho constitucionalmente reconocido a la ciudadanía —como lo es el derecho a la libertad de expresión— el balance de intereses que el Poder Legisla-tivo llevó a cabo al legislar queda sujeto al balance de in-tereses que tiene que efectuar el Poder Judicial a favor del derecho reclamado. Cuando las garantías constitucionales que protegen a las personas del ejercicio arbitrario de los poderes estatales se ven amenazadas por cualquier actua-ción u omisión gubernamental, debemos escrutar la contro-versia de manera que favorezca el ejercicio de los derechos invocados, a menos que el Estado muestre tener un interés apremiante que justifique la limitación al derecho reclamado. En esas circunstancias se impone, pues, un es-crutinio estricto. Ello de acuerdo con nuestra obligación de velar por. que ninguna actuación del Estado intervenga irrazonablemente con el ejercicio de los derechos funda-mentales de las personas.
En cambio, no es necesario sopesar intereses para deter-minar si procede un reclamo de información que se haga al Ejecutivo si dicho reclamo no está fundamentado en dere-chos constitucionales de la ciudadanía, sino en los poderes constitucionales de una rama del gobierno frente a otra. Según lo expresado, nuestro deber constitucional al delimi-tar los poderes investigativos de la Rama Legislativa en su función fiscalizadofa ante el Ejecutivo, nos obliga a proce-der con deferencia y a presumir la razonabilidad y legiti-midad de los actos y procedimientos legislativos. Por eso, el análisis jurídico que procede cuando la información reque-rida por la Rama Legislativa al Ejecutivo, en su función fiscalizadora, esté vedada al escrutinio público por una ley que establezca su confidencialidad, no.es el de sopesar in-tereses, sino el análisis que impone nuestra tradición cons- *434 titucional ante las actuaciones de la Rama Legislativa, el llamado análisis tradicional.(19)
r — i I — I I — I
En el caso de autos debemos determinar si la Asamblea Legislativa ha usado su poder investigativo de manera ar-bitraria o si el ejercicio de este poder es constitucional-mente válido, según los dos límites que típicamente im-pone la Constitución a las ramas de gobierno en un Estado de Derecho, la doctrina de separación de poderes y la Carta de Derechos. En fin, nos corresponde analizar si la Comi-sión tiene jurisdicción para ejercer el poder que reclama, si su investigación persigue un propósito legislativo legítimo y si la utilización de ese poder conlleva la invasión de al-guna prerrogativa consagrada en la Carta de Derechos.
A. La Cámara de Representantes no puede exceder sus poderes investigativos y usurpar poderes de otras ra-mas del Gobierno. A tono con ese requisito, el Poder Legis-lativo de investigación tiene que limitarse a los asuntos para los cuales tiene jurisdicción. Como cuestión de um-bral, para que las comisiones legislativas operen dentro de nuestro esquema constitucional, deben estar legalmente constituidas. Cumplido este mandato, las comisiones sólo pueden dedicarse a investigar aquello que se les asigne mediante una resolución debidamente aprobada. Hernández Agosto v. Betancourt, supra. (20)
Las resoluciones legislativas que autorizan investigacio-nes deben tener un fin legítimo. Es decir, deben perseguir un fin que caiga dentro de los poderes constitucionales de *435 la Rama Legislativa. De ser así, los tribunales están obli-gados a presumir la legitimidad del propósito de la actua-ción legislativa. Banco Popular, Liquidador v. Corte, supra.(21) Además de poseer una finalidad legítima, las re-soluciones que autorizan las investigaciones legislativas deben ser específicas, de manera que los tribunales no cai-gan en procesos de racionalización retrospectiva.(22)
Debe quedar claro que, aunque los tribunales no deben establecer reglas rígidas según las cuales la Asamblea Le-gislativa deba redactar sus resoluciones, si hay derechos de individuos afectados, el tribunal deberá intervenir.(23) Por ello, este Tribunal se verá en la necesidad de delinear los límites constitucionales al poder investigativo de la Asamblea Legislativa, sólo cuando se demuestre de ma-nera inequívoca que ésta ha autorizado una investigación de dudoso alcance. (24)
La Asamblea Legislativa, mediante su poder de regla-mentación interna, promulgó el Reglamento de la Cámara de Representantes de Puerto Rico, R. de la C. 1, 15ta Asamblea Legislativa, Ira Sesión Ordinaria, 2 de enero de 2005. En su Regla 11, dicho Reglamento regula todo lo per-tinente al funcionamiento de las comisiones de la Cámara. Según la Sección 11.1, los trabajos de la Cámara de Repre-sentantes se organizarán a través de Comisiones Perma-nentes o Especiales. En cuanto a la Jurisdicción de las Co-misiones, la Sección 11.2, supra, pág. 26, establece:
*436 Se remitirán a las Comisiones Permanentes y Especiales los proyectos, resoluciones, mensajes, peticiones, memoriales y documentos, tomando como base la jurisdicción en particular de cada Comisión, según ésta se establezca en la Resolución de la Cámara que se adopte para la creación y determinación de jurisdicción de las Comisiones.
La .Regla 13, Sección 13.1 del Reglamentp, supra, pág. 29, prescribe que las Comisiones Permanentes tendrán las funciones y facultades siguientes:
(a) redactar y presentar proyectos de ley, resoluciones y me-didas legislativas sustitutivas;
(b) investigar, estudiar, evaluar, informar, hacer recomen-daciones, enmendar o sustituir aquellas medidas legislativas que le hayan sido referidas o asuntos relacionados con su ju-risdicción; .
(c) revisar y ejercer supervisión continua sobre la implanta-ción y administración de todas aquellas leyes que correspon-dan a los asuntos incluidos en su jurisdicción. Para el logro de ello, estudiará los informes y datos pertinentes sometidos por los organismos del Gobierno a la Cámara y realizará las inves-tigaciones necesarias;
(d) celebrar audiencias públicas o vistas públicas, vistas oculares y reuniones ejecutivas, citar testigos, escuchar testi-monios, inclusive bajo juramento, y solicitar toda aquella in-formación documental o de cualquier otra naturaleza que con-sidere necesaria para su gestión.
Por su parte, el Reglamento de la Comisión de Bienes-tar Social establece en su Sección 2.2 que:
Conforme a la Resolución de la Cámara Núm. 2 de 2 de enero de 2005, la Comisión de Bienestar Social tendrá juris-dicción sobre medidas legislativas dirigidas al funcionamiento y la provisión de todo tipo de servicios de bienestar social en Puerto Rico. Sin que se entienda como limitación, tendrá inje-rencia sobre asuntos que atañen las comunidades margina-das, personas de edad avanzada, personas con impedimentos físicos o mentales, personas sin techo, personas con problemas de adicción o con comportamientos compulsivos, menores víc-timas de violencia doméstica, a fin de establecer la política pública que propicie el mejor nivel de servicios que requieran estas poblaciones, a nivel estatal, regional o local.
*437 La Comisión velará porque las referidas poblaciones tengan, entre otros, los beneficios de asistencia económica, rehabilita-ción física, económica y emocional, asistencia nutricional y provisión de alimentos, así como la provisión de servicios de centros de cuido o amas de llave, según sea el caso.
La Comisión tendrá facultad de investigar, evaluar, infor-mar y hacer recomendaciones sobre los asuntos ante su consideración. Además evaluará y velará por el buen funcio-namiento de aquellas agencias, departamentos, oficinas, juntas, corporaciones públicas, municipios y demás entidades del gobierno del Estado Libre Asociado de Puerto Rico, a los fines de determinar si las mismas cumplen efectivamente con las leyes y reglamentos aprobados en virtud de ley.
La Comisión tendrá jurisdicción sobre cualesquiera otros asuntos referidos a ésta por la Cámara de Representantes, o por el Presidente de ese cuerpo, relacionados con asuntos so-bre los que tiene jurisdicción, según lo dispuesto en la Resolu-ción de la Cámara Núm. 2, aprobada el 10 de enero de 2005.
La Sección 4.1 del referido Reglamento de la Comisión dispone las funciones y facultades de la Comisión, entre éstas:
(a) Redactar y preparar Proyectos de Ley, Resoluciones y Medidas Legislativas sustitutivas.
(b) Investigar, estudiar, evaluar, informar, hacer recomen-daciones, enmendar o sustituir aquellas medidas legislativas que le hayan sido referidas o asuntos relacionados con su jurisdicción.
(c) Celebrar vistas .públicas y reuniones ejecutivas, citar testigos, escuchar testimonios, inclusive bajo juramento y so-licitar toda aquella información documental o de cualquier •otra naturaleza que considere necesaria para su gestión.
(d) Ejercer supervisión continua sobre la implantación y ad-ministración de aquellas leyes que correspondan a los asuntos incluidos en su jurisdicción. Para el logro de ello, estudiará los informes y datos pertinentes sometidos por los organismos de Estado Libre Asociado a la Cámara y realizará las investiga-ciones necesarias.
(e) Investigar, estudiar, evaluar, informar, hacer recomen-daciones, enmendar o sustituir aquellas medidas o encomien-das que le hayan sido referidas por el Presidente, así como por la Cámara de Representantes.
*438 De la letra de ambos reglamentos surge el poder inves-tigativo conferido por la Asamblea Legislativa a la Cámara de Representantes, que ésta a su vez delegó en la Comisión para investigar y fiscalizar el cumplimiento de las leyes relacionadas a asuntos tales como el maltrato infantil. El evaluar el cumplimiento de las funciones delegadas al De-partamento de Familia está claramente bajo su jurisdic-ción, al igual que el recomendar posibles acciones adminis-trativas y legislativas en torno a los procedimientos seguidos por este Departamento del Ejecutivo. La Resolu-ción Núm. 2756 de 13 de septiembre de 2005 se adopta en el marco de esa delegación y encomienda la investigación que da pie al recurso exclusivamente en cuanto a los pro-cedimientos seguidos por el Departamento de la Familia. El decreto promulgado por la Cámara de Representantes de Puerto Rico en esta Resolución consta de dos secciones que disponen:
Sección 1- Se ordena a la Comisión de Bienestar Social de la Cámara de Representantes de Puerto Rico realizar una inves-tigación en torno a los procedimientos seguidos por el Depar-tamento de la Familia en el caso del niño Matthew Elias Amigo y sus hermanos.
Sección 2- la Comisión de Bienestar Social someterá a la Cámara de Representantes un informa contentivo de sus ha-llazgos, conclusiones y aquellas recomendaciones que estime pertinentes, incluyendo las acciones legislativas y administra-tivas que deben adoptarse con relación al asunto objeto de esta investigación, dentro de los 60 días, después de aprobarse esta Resolución. Apéndice de la Petición de certiorari, pág. 91.
De lo anterior se colige que la Comisión está constitu-cionalmente autorizada a inquirir sobre el funcionamiento del Departamento de la Familia en el caso de epígrafe. Ahora bien, la Comisión ha requerido no sólo la compare-cencia de dicha instrumentalidad, sino la comparecencia del Departamento de Justicia, así como el acceso a expe-dientes que éste tiene bajo su custodia. La Resolución Núm. 2756 no delega a la Comisión de Bienestar Social *439 facultad alguna para fiscalizar al Departamento de Justi-cia, por lo que la pesquisa legislativa se debe limitar al Departamento de la Familia.
B. Una vez resuelto que la Comisión está autorizada a escrutar las acciones del Departamento de la Familia, de-bemos evaluar si hay un propósito legislativo legítimo para el ejercicio de ese poder investido. En Quinn v. U.S., supra, el Tribunal Supremo de Estados Unidos advirtió que el po-der de investigación no debe confundirse con los poderes para ejecutar las leyes de la Rama Ejecutiva o para adju-dicar controversias de la Rama Judicial. Véase también Watkins v. United States, supra, donde, además, se indicó que ninguna pesquisa implica, de por sí, un propósito le-gislativo y que la mera apariencia de este propósito no jus-tifica una investigación.
En este caso, la inquisición tiene un propósito clara-mente legislativo, tanto en su fin último que es el de posi-blemente proponer legislación, como en su medio, que es la labor de supervisión al Ejecutivo. Ambas facultades, como hemos discutido, son propias de los parlamentos democrá-ticos de los gobiernos republicanos con estructura tripartita.
C. Por último, al ejercer nuestra prerrogativa de en-tronque constitucional debemos auscultar tanto la infor-mación que la Comisión pretende obtener mediante el subpcena emitido al Departamento de la Familia, como sus métodos para obtenerla. Al así proceder, nuestro rol es evi-tar lesiones a algún derecho comprendido en nuestra Carta de Derechos.
A mediados del siglo pasado, en el contexto de las inves-tigaciones legislativas a individuos que testificaban ante una de las comisiones del Congreso, la jurisprudencia es-tadounidense comenzó a forjar una limitación constitucio-nal a las pesquisas que podían afectar de alguna manera las protecciones reconocidas a las personas en la Carta de *440 Derechos. Es precisamente en el contexto de las investiga-ciones compulsorias que ha surgido históricamente la ne-cesidad de proteger los derechos individuales. (25) Por ello, según reconoce la opinión en el caso Sinclair v. United States, 279 U.S. 263 (1929), desde Kilbourn v. Thompson, 103 U.S. 168 (1880), se ha ido erigiendo un baluarte contra las amplísimas intromisiones legislativas en los asuntos pri-vados de los individuos que están constitucionalmente tutelados. Dicho caso estableció que todas las investigacio-nes del Congreso de Estados Unidos debían entenderse como limitadas por la Carta de Derechos, pues los princi-pios que encarnan la esencia de la libertad amparada por la Constitución prohíben toda invasión gubernamental en él santuario del hogar y en las intimidades de la vida individual, ya sea por urna de sus Ramas o por la actuación de algún funcionario.
En Watkins v. United States, supra, el Tribunal Supremo de Estados Unidos expresó que cuando la Asamblea Legislativa ejerce su poder de investigación con propósitos ñscalizadores, carece del poder para aprobar resoluciones tan amplias que le permitan indagar en áreas protegidas por el derecho a la intimidad que no estén relacionadas con la ineficiencia o corrupción gubemamental.(26)
El caso Sinclair v. United States, supra, subrayó la re-nuencia del Tribunal Supremo de Estados Unidos a inter-pretar un acto del Congreso de manera tal que autorice el examen de un testigo en cuanto a sus asuntos personales. Por eso estableció que la. protección provista en la Cuarta enmienda de la Constitución de Estados Unidos limita las investigaciones legislativas.(27)
*441 La misma protección la confiere nuestra Carta de Dere-chos contenida en el Artículo II de la Constitución, cuando dispone en sus Secciones 8 y 10 que el Gobierno, actuando a través de cualquiera de sus tres ramas debe garantizar, por un lado, que “toda persona tiene protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar” y, por otro, que “[n]o se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables”. Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, págs. 317 y 326. Se ha dicho que estas secciones consustan-ciales protegen a nuestra ciudadanía puertorriqueña de una manera más abarcadora que la Constitución federal contra actuaciones arbitrarias e irrazonables del Estado que tras-toquen esferas consideradas social, cultural o tradicional-mente como íntimas. Rullán v. Fas Alzamora, supra. Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924, 948-949 (2000); H.M.C.A. (P.R.), Inc., etc. v. Contralor, supra.(28)
Hemos aplicado estos principios al analizar los poderes investigativos del Contralor, los cuales, según hemos establecido, son semejantes en su alcance a la amplia facultad investigativa de la asamblea legislativa. H.M.C.A. (P.R.), Inc., etc. v. Contralor, supra. Así, en RDT Const. Corp. v. Contralor I, 141 D.P.R. 424, 433 (1996), no obstante, al reconocer que los poderes investigativos delegados al Con-tralor son tan amplios como sea necesario para desempe-ñar cumplidamente su encomienda constitucional, conferi-mos una protección al investigado cuando la información *442 requerida por el Contralor se encuentre en poder de un tercero. En la opinión emitida en RDT Const. Corp. v. Contralor II, 141 D.P.R. 861, 863-864 (1996), aclaramos el mecanismo que establecimos en RDT Const. Corp. v. Contralor I, supra, para asegurar que los tribunales tengan una oportunidad de evaluar la razonabilidad de un subpoena dirigido a un tercero y determinar su procedencia, si quien está siendo investigado decide impugnarlo. Este meca-nismo consiste en notificar a la persona en quien se ha centrado la investigación cuando se le requiriera a un ter-cero la producción de documentos sobre los cuales el inves-tigado alberga una expectativa de intimidad.
Nuevamente aplicamos e hicimos más estricto dicho me-canismo de notificación en Rullán v. Fas Alzamora, supra. Ese caso guarda mucha relación con el de autos. En aque-lla ocasión, la Asamblea Legislativa aprobó una resolución para efectuar urna investigación con el fin de fiscalizar a la televisora del Gobierno. Dicha resolución delegaba su eje-cución a una comisión legislativa especial. Como parte de la investigación, la comisión le solicitó al Departamento de Hacienda una copia de las planillas e información de ín-dole contributiva perteneciente a los demandantes en ese caso, pero custodiada por dicho Departamento. Aun cuando una ley autorizaba la divulgación de la información reque-rida, fuimos más que enfáticos al recalcar la expectativa de intimidad que tenían los demandantes de ese caso sobre los documentos solicitados y, por ende, el derecho que te-nían a ser debidamente notificados. El requisito de notifi-cación no pretende otra cosa que darle una oportunidad a quien posee una expectativa de intimidad sobre cierta in-formación en manos de tercero, para que intervenga en la solicitud y levante las defensas, las objeciones y los argu-mentos constitucionales que estime pertinentes. Estos de-rechos limitan el amplio poder investigativo de la Asam-blea Legislativa.
La Comisión de Bienestar Social, mediante el subpoena *443 que nos solicita que pongamos en vigor, requirió al Depar-tamento de la Familia la entrega de todos aquellos docu-mentos, expedientes e información que obren en su poder, entre éstos el historial del expediente del niño Mathew Elias Amigo y el de sus hermanos, el referido inicial del caso, evidencia escolar de los menores, toda documentación entregada por los padres de los menores al Departamento de la Familia y toda documentación requerida por dicha instrumentalidad a los padres de los menores. El subpoena incluye material sensitivo, cuya publicidad podría acarrear serias repercusiones emocionales y sociales para unos me-nores de edad que a tan tierna edad pasan por una etapa de gran inestabilidad. Es nuestro deber irrenunciable velar por la seguridad y estabilidad de las personas que se encuentran en situaciones de vulnerabilidad ante acciones del Estado(29) particularmente cuando se trata de menores de edad. La Comisión también solicitó evaluaciones psico-lógicas y psiquiátricas de los padres de los menores.
Como surge de los hechos de este caso que se detallan en la sentencia, el Tribunal de Apelaciones aceptó que los padres de los niños no han comparecido ni consta en los autos que se les haya emitido notificación alguna sobre el alcance de esta investigación legislativa. Si en Rullán v. Fas Alzamora, supra, protegimos la expectativa de intimi-dad sobre información contributiva e invalidamos un subpoena legislativo por no haber sido debidamente notificado, forzosamente debemos proceder de manera más enérgica en un caso como el de autos. Es menester resolver, en aras de salvaguardar los derechos de intimidad que *444 nuestro ordenamiento le provee a las personas sujetas a investigaciones gubernamentales, que la Asamblea Legis-lativa debe notificarle a los padres de los menores acerca de la investigación que se pretende llevar a cabo. En la notificación se deberá explicitar la información solicitada que les atañe personalmente, de manera que puedan de-fenderse debidamente y vindicar sus derechos consti-tucionales. También se les debe notificar debidamente so-bre el alcance del subpoena en cuanto a la información re-querida de los hijos(30) sobre los cuales aún tienen patria potestad.(31) Dichas notificaciones deben cumplir con los re-quisitos que hemos establecido mediante jurisprudencia, particularmente los esbozados en Rullán v. Fas Alzamora, supra.
IV
Por los fundamentos expuestos, la citación enviada al Departamento de Justicia no procede por falta de jurisdic-ción, ya que la Resolución Núm. 2756 no delegó la enco-mienda a la Comisión. En cuanto a la citación cursada al Departamento de la Familia, este Tribunal no puede hacer cumplir el subpoena cursado a este Departamento hasta tanto se cumpla con el requisito de notificación establecido en nuestra jurisprudencia. Por estas razones, estoy con-forme con la decisión de revocar la sentencia del Tribunal de Apelaciones.

 Véase, además, J. Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 151, 159 (1926).

 Las facultades de indagación legislativa se han concebido como una herra-mienta indispensable para alcanzar una legislación juiciosa que demuestre un sólido y cabal entendimiento del contexto en el que se genera. McGrain v. Daugherty, 273 U.S. 135 (1927). Las investigaciones del Poder Legislativo son consideradas como elemento tradicional de los gobiernos representativos. Tenney v. Brandhove, 341 U.S. 367 (1951). El Tribunal Supremo estadounidense ha descrito este poder como inhe-rente a los procedimientos legislativos, y correlativo al poder de legislar. Watkins v. United States, 354 U.S. 178 (1957); Quinn v. U.S., 349 U.S. 155 (1955). Se ha dicho que no pueden haber dudas acerca del poder de la Asamblea Legislativa a realizar como cuerpo, o a través de alguno de sus comités, investigaciones sobre asuntos relacionados a legislación vislumbrada. Quinn v. U.S., supra. Más aún, ha quedado establecido que este poder de inquirir se ha usado a través de la historia en función de toda una gama de intereses nacionales sobre los cuales la Asamblea Legislativa decide, según los resultados de la investigación misma, si procede o no legislar. Barenblatt v. United States, 360 U.S. 109 (1959).

 La importancia de la facultad de inspección de las actividades del Ejecutivo fue excelentemente resumida por el Tribunal Supremo de Estados Unidos en el caso Tenney v. Brandhove, supra, pág. 377 esc. 6:
“It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the *423 voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by eveiy form of discussion, the country must remain in embarrassing crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred to its legislative function.”
Véase, además, L. Fisher, Constitutional Conflicts Between Congress and the President, 4ta ed., Kansas, U. Press Kansas, 2007.

 Véase, además, Landis, supra, págs. 194 y 197.

 íd., pág. 209.

 Las Secciones 1 y 17 del Artículo III disponen, en lo pertinente:
“Sección 1. El poder Legislativo se ejercerá por una Asamblea Legislativa, que se compondrá de dos cámaras —el Senado y la Cámara de Representantes— cuyos miembros serán elegidos por votación directa en cada elección general.”
“Sección 17. Ningún proyecto de ley se convertirá en ley, a menos que se im-prima, se lea, se remita a comisión y esta lo devuelva con un informe escrito; pero la cámara correspondiente podrá descargar a la comisión del estudio e informe de cual-quier proyecto y proceder a la consideración del mismo.” Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, págs. 365 y 378-379.

 Véanse, además: 2 Diario de Sesiones de la Convención Constituyente 854 (1951); 4 Diario de Sesiones, supra, pág. 2584.

 Véase, además, Landis, supra, pág. 199.

 Históricamente, y en momentos de apasionamiento político, se han hecho acusaciones e insinuaciones sobre las motivaciones que conducen a las comisiones legislativas en sus procesos investigativos. Reiteradamente, tanto este Tribunal como eí Tribunal Supremo estadounidense han expresado que los tribunales no son el foro para ventilar tales controversias, pues ello corresponde a los procesos políticos *429 y electorales. Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984); Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983).

 United States v. Rumely, 345 U.S. 41 (1953).

 Barenblatt v. United States, supra.

 Tenney v. Brandhove, supra; Barenblatt v. United States, supra; Kilbourn v. Thompson, 103 U.S. 168 (1880).

 Tenney v. Brandhove, supra; McGrain v. Daugherty, 273 U.S. 135 (1927).

 Véase, también, Barenblatt v. United States, supra.

 La razón es que las investigaciones legislativas dirigidas a oficiales ejecuti-vos o agencias públicas encierran consideraciones distintas de las que imperan en las investigaciones dirigidas a ciudadanos particulares. Véanse: McGrain v. Daugherty, supra (investigación al Secretario de Justicia); Tenney v. Branhove, supra (investigación a un individuo); R. Berger, Congressional Subpoenas to Executive Officials, 75 Columbia L. Rev. 865, 869-870 (1975).

 Ello, a pesar de que expresamos que no habíamos hallado decisión alguna en la que se empleara el método de sopesar intereses en una controversia de este tipo.

 Véase A. Acevedo Vilá, Asamblea Legislativa y su Poder Investigativo, 56 (Núm. 2) Rev. C. Abo. P.R. 61 (1995).

 En ese caso concluimos que, aun cuando el legislador haya establecido la estricta confidencialidad de la información obtenida por una agencia del Ejecutivo, y aun cuando al aplicar las doctrinas sobre el acceso a la información y efectuar el análisis del balance de intereses a favor de la divulgación prevaleciera un interés apremiante del Estado en la confidencialidad, el público tiene acceso a la información elaborada a partir de la información obtenida, si bien ésta permanece confidencial.

 P.C. Rosenthal y R.S. Grossman, Congressional Access to Confidential Information Collected by Federal Agencies, 15 Harvard J. on Legislation 74, 100-118 (1977).

 En Watkins v. United States, supra, el Tribunal Supremo estadounidense calificó de “jurisdictional concept of pertinency” a este aspecto de las instigaciones legislativas.

 Véase, además, Sinclair v. United States, 279 U.S. 263 (1929).

 Watkins v. United States, supra; Kilbourn v. Thompson, supra.

 Watkins v. United States, supra.

 En este punto nos parece pertinente ilustrar el tema con una cita de United States v. Rumely, 345 U.S. 41, 42 (1953):
“Although the indispensable informing function of congress is not to be minimized, determination of the rights which this function implies illustrates the common juristic situation thus defined for the Court by Mr. Justice Holmes: “All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached.”

6) Watkins v. United States, supra.

 Íd., pág. 200 esc. 30.

 Véanse, también: Marshall v. Gordon, supra; MeGrain v. Daugherty, supra; Tenney v. Brandhove, supra. Se ha resuelto que la Primera y Quinta enmienda de la Constitución de Estados Unidos también aplican a las investigaciones legislativas hechas a individuos. Sobre la aplicación de la Primera Enmienda, véase Watkins v. *441 United States, supra, pág. 188. Sobre la aplicación de la Quinta enmienda, véanse: McPhaul v. United States, 364 U.S. 372 (1960); Emspak v. United States, 349 U.S. 190 (1955); Quinn v. U.S., supra, pág. 162 (1955); Rogers v. United States, 340 U.S. 367 (1951).

 Véanse, además: Pueblo v. Méléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. Muñoz, Colony Ocasio, 131 D.P.R. 965 (1992); Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562 (1992); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828, (1986); Pueblo v. Dolce, 105 D.P.R. 422 (1976).

 Véanse: Doe v. McMillan, 412 U.S. 306 (1973); Rivera v. Morales, 167 D.P.R. 280 (2006); Ortiz v. Meléndez, 164 D.P.R. 16 (2005); Pueblo v. Santiago Torres, 154 D.P.R. 291 (2001); Pueblo v. Arocho Soto, 137 D.P.R. 762 (1994); Rodríguez del Valle v. Corcelles Ortiz, 135 D.P.R. 834 (1994); Pueblo en interés menores R.P.S. et al., 134 D.P.R. 123 (1993); Martínez v. Ramírez Tió, 133 D.P.R. 219 (1993); Sterzinger v. Ramírez, 116 D.P.R. 762 (1985); Ortiz v. Vega, 107 D.P.R. 831(1978); Muñoz v. Torres, 75 D.P.R. 507 (1953); Valentín v. Registrador, 61 D.P.R. 218 (1942); Baba v. Rodríguez, 36 D.P.R. 502 (1927).

 Como todo individuo, los menores tienen un derecho de intimidad constitu-cionalmente protegido. Pueblo v. Arocho Soto, supra; New Jersey v. T.L.O., 469 U.S. 325 (1985); Carey v. Population Svcs. Int’l, 431 U.S. 678 (1977); In re Gault, 387 U.S. 1 (1967).

 Si bien es cierto que el Departamento de la Familia es quien tiene la custo-dia legal de los menores, también es cierto que no ha habido procedimiento alguno de suspensión o privación de la patria potestad.